165 P.3d 916

COUNTY OF KAUAʻI, by its County Attorney Lani D. NAKAZAWA, Plaintiff–Appellee,

v.

Bryan J. BAPTISTE, Mayor, County of Kauai; Michael H. Tresler, Director of Finance, County of Kauaʻi; and Kauaʻi County Council, Defendants–Appellees,

and

Gordon G. Smith, individually; Walter S. Lewis, in his capacity as Trustee of the Walter S. Lewis Revocable Living Trust; Monroe F. Richman, Trustee, Richman Family Trust; and Ming Fang, Trustee, Ming Fang Trust, Intervenors–Appellants.

No. 27351.

Supreme Court of Hawaiʻi.

Aug. 6, 2007.

As Corrected Aug. 7, 2007.

Reconsideration Denied Sept. 6, 2007.

Robert H. Thomas (of Damon Key Leong Kupchak Hastert), Honolulu, for intervenors-appellants.

Gary M. Slovin (Russell S. Kato and Corlis J. Chang, with him on the briefs, of Goodsill Anderson Quinn & Stifel, Honolulu, and Lani D.H. Nakazawa, Kaua'i County Attorney, with him on the briefs), for plaintiff-appellee.

Rosa V. Flores (Christiane L. Nakea–Tresler, Deputy County Attorney, on the brief), for defendants-appellees.

MOON, C.J., LEVINSON, and NAKAYAMA, JJ.

Opinion of the Court by MOON, C.J.

Intervenors-appellants George S. Smith, individually; Walter S. Lewis, in his capacity as Trustee of the Walter S. Lewis Revocable Living Trust; Monroe F. Richman, Trustee, Richman Family Trust; and Ming Fang, Trustee, Ming Fang Trust [hereinafter, collectively, the Appellants] appeal from the Circuit Court of the Fifth Circuit's [1] May 20, 2005 final judgment entered pursuant to the order granting plaintiff-appellee County of Kauai's (the County) motion for summary judgment. In granting summary judgment

1. The Honorable George M. Masuoka presided over the underlying proceedings.

in favor of the County, the circuit court concluded that a voter-initiated and voter-approved charter amendment limiting real property taxes (the Charter Amendment) was void under the Revised Charter of the County of Kaua'i (RCCK) and violated the Constitution of the State of Hawai'i (the Hawai'i Constitution).

Briefly stated, in 1978, the voters of the State of Hawai'i (the State) approved proposed amendments to the Hawai'i Constitution that: (1) transferred exclusive power over real property taxation from the State to "the counties," see Haw. Const. art. VIII, § 3, quoted infra; and (2) established an eleven-year transition period during which "the policies and methods of assessing real property taxes shall be uniform throughout the State and shall be established by agreement of a majority of the political subdivisions." See Haw. Const. art. XVIII, § 6, quoted infra. In November 1989, the requirements of statewide uniformity for the assessment of real property taxation lapsed. See Weinberg v. City & County of Honolulu, 82 Hawai'i 317, 324, 922 P.2d 371, 378 (1996).

In 2004, the Appellants, as part of a group known as Ohana Kaua'i, successfully circulated a petition that proposed an amendment to the RCCK, essentially decreasing and limiting real property taxes for certain county residents, which was then placed on the ballot for the November 2004 general election. On October 25, 2004, prior to the election, the County, through the County Attorney, sought declaratory relief from the circuit court, alleging that the proposed Charter Amendment was "in fact an attempt to amend the existing ordinances of the County which govern the assessment of real property" (emphasis in original) and, as such: (1) was void pursuant to the RCCK's limitation on ordinances by initiative that affect taxes; (2) violated the Hawai'i Constitution; and (3) was otherwise void for vagueness.

The proposed Charter Amendment was ultimately approved by the voters. Consequently, following the election, the County

amended its earlier complaint, naming Mayor Bryan J. Baptiste, Finance Director Michael H. Tresler, and the Kaua'i County Council (i.e., those allegedly responsible for implementing the Charter Amendment) as defendants [hereinafter, collectively, the Defendants]. The Appellants intervened and moved to dismiss the County's first amended complaint [hereinafter, the second motion to dismiss[2]]; the County, in turn, moved for summary judgment. The circuit court denied the Appellants' second motion to dismiss, granted the County's motion for summary judgment, and entered final judgment in favor of the County. The Appellants' timely appeal followed.

On appeal, the Appellants essentially contend that the circuit court erred in denying their second motion to dismiss inasmuch as (1) the County lacked standing, (2) there was a lack of an actual controversy, and (3) the claim was not ripe. The Appellants also challenge the circuit court's grant of summary judgment in favor of the County, contending that (1) the Charter Amendment was not void under the RCCK and (2) the Charter Amendment did not violate the Hawai'i Constitution.

For the reasons discussed below, we affirm in part and reverse in part the circuit court's May 20, 2005 final judgment.

## I. BACKGROUND

### A. Historical Background

This court previously set forth the historical background of the 1978 amendments to the Hawai'i Constitution pertaining to the power to tax real property in State ex rel. Anzai v. City & County of Honolulu, 99 Hawai'i 508, 57 P.3d 433 (2002):

At one point in Hawaii's history, all taxation authority was unequivocally vested in the State. The 1968 Hawai'i Constitution provided as follows:

The taxing power shall be reserved to the State except so much thereof as may be delegated by the legislature to the

**2.** As explained more fully infra, the Appellants' first motion to dismiss was denied by the circuit court because it was filed prior to the grant of the Appellants' motion to intervene in the case.

After the Appellants were permitted to intervene, they filed the second motion to dismiss, which is the subject of the instant appeal.

political subdivisions, and the legislature shall have the power to apportion state revenues among the several political subdivisions.

Haw. Const. art. VII, § 3 (1968). However, following the 1978 State Constitutional Convention, article VII, section 3 was renumbered and amended to include a provision vesting exclusive taxation authority over real property in the counties. Currently, the relevant section reads as follows:

The taxing power shall be reserved to the State, except so much thereof as may be delegated by the legislature to the political subdivisions, and *except that all functions, powers and duties relating to the taxation of real property shall be exercised exclusively by the counties,* with the exception of the county of Kalawao. The legislature shall have the power to apportion state revenues among the several political subdivisions.

Haw. Const. art. VIII, § 3 (1978) (emphasis added). Contemporaneously, revisions were made to article XVIII to ensure an orderly transition of the power to tax real property. Specifically, the 1978 Constitution provided that,

for a period of eleven years following . . . ratification [which occurred on November 7, 1978], the policies and methods of assessing real property taxes shall be uniform throughout the State and shall be established by agreement of a majority of the political subdivisions. Each political subdivision shall enact such uniform policies and methods of assessment by ordinance before the effective date of this amendment [July 1, 1981], and in the event the political subdivisions fail to enact such ordinances, the uniform policies and methods of assessment shall be established by general law. Any amendments to the uniform policies and methods of assessment established by the political subdivisions may only be made by agreement of a majority of the political subdivisions and enactment thereof by ordinance in each political subdivision.

Real property tax exemptions . . . as provided by law and in effect upon ratification . . . shall be enacted by ordinance and shall not be eliminated or diminished for a period of eleven years following such ratification; provided that increases in such exemptions, or the additions of new and further exemptions or dedications of lands, may be established or granted only by agreement of a majority of the political subdivisions, and such increases or additions shall be enacted by ordinance in each political subdivision.

Haw. Const. art. XVIII, § 6 (1978). . . . In response to these constitutional amendments, the legislature, in 1980, enacted HRS [c]hapter 246A with the stated purpose of "provid[ing] for the orderly transfer of these functions, powers, and duties, including the transfer of personnel, records, and equipment to the counties." 1980 Haw. Sess. L. Act 279, § 1 at 534 (presently codified at HRS § 246A–1 (1993)). . . .

*Id.* at 510–11, 57 P.3d at 435–36 (some ellipses in original and some added) (some emphases omitted).

B. *The Charter Amendment*

The Appellants, as representatives of the group Ohana Kaua'i, sought to place a proposed charter amendment on the 2004 general election ballot. Generally, charter amendments via an initiative process are permitted under Article XXIV of the RCCK, which provides in relevant part:

Section 24.01. *Initiation of Amendments.* Amendments may be initiated only in the following manner:

. . . .

B. By petition presented to the council, signed by not less than five percent (5%) of the voters registered in the last general election, setting forth the proposed amendments. . . . Upon filing of such petition with the council, the county clerk shall examine it to see whether it contains a sufficient number of apparently genuine signatures of voters.

Section 24.02. *Elections to be Called.*

A. Any ... petition of the voters proposing amendments to the charter shall provide that the proposed amendments shall be submitted to the voters of the county at the next general election.

B. The county clerk shall have the proposed amendments published in a newspaper of general circulation in the county at least thirty (30) days prior to submission of the proposed amendments to the voters of the county at the next general election.

C. Should the majority of the voters voting thereon approve the proposed amendments to this charter, the amendments shall become effective at the time fixed in the amendment, or, if no time is fixed therein, thirty (30) days after its adoption by the voters of the county. Any charter amendment shall be published in a newspaper of general circulation in the county within thirty (30) days of the effective date of such amendment.

In compliance with the aforementioned procedures, the Appellants submitted to the Kaua'i county clerk the proposed Charter Amendment in the form of a petition. On July 30, 2004, the Kaua'i county clerk notified Ohana Kaua'i that he had confirmed that the petition had the requisite number of signatures to allow submission to the voters in the 2004 general election. The Kaua'i County Attorney's office acknowledged the proposed Charter Amendment by letter to the Appellants dated August 27, 2004, stating that no opinion was expressed as to the proposed Charter Amendment's substantive provisions.

C. *The County's Complaint and First Amended Complaint*

On October 25, 2004, the County Attorney, acting on behalf of the County, filed a Complaint for Declaratory Relief, captioned *In Re Proposed Kaua'i Charter Amendment* (the initial complaint), seeking a declaratory judgment that the proposed Charter Amendment, which would appear on the November 2, 2004 ballot, was void. The proposed Charter Amendment provided:

**AMENDMENT TO THE CHARTER OF THE COUNTY OF KAUA'I**

Shall the Kaua'i County Charter be amended by the addition of a new Article XXXI to read:

ARTICLE XXXI. RESIDENT PROPERTY TAXES. Section 31.01. Resident Property Taxes.

It is the policy of the County that resident taxpayers should be equitably protected when there are significantly rising real estate values and government costs. Therefore, for County residents who have owned and occupied their place of residence beginning in or before the fiscal year 1998–1999, then for the next fiscal year after the adoption of this section real property taxes with respect to such residence shall not exceed the amount of such tax assessed for the 1998–1999 fiscal year. For County residents acquiring their place of residence after the fiscal year 1998–1999 their real property taxes with respect to such residence for the next fiscal year after the adoption of this section shall not exceed the amount of tax assessed for the fiscal year the ownership and residence commences. For all such taxpayers in no fiscal year after the year in which the tax was restored to the amount in 1998–1999 or the year of acquisition, whichever is applicable, shall the percentage increase in real property tax with respect to such residence exceed the lesser of the percentage rate applicable at the commencement of such fiscal year for cost of living adjustments in retirement benefits by the Social Security Administration, or two percent (2%). Promptly following its adoption the County shall notify in writing all owners of residential property in its property tax records of the principal terms of this section. The County shall adopt such ordinances, laws, rules and regulations as are necessary to carry out and are consistent with the purpose of the foregoing policy and the terms of this section.

(Capitalization and line breaks in original.) (Internal quotation marks omitted.)

The proposed Charter Amendment, if adopted, would essentially decrease and limit real property taxes for county residents—a function that the County alleged was reserved to the County Council. The initial complaint alleged that the proposed Charter

**22**

Amendment was void under the RCCK, violated the Hawai'i Constitution, and was otherwise void for vagueness. Two days later, on October 27, 2004, the County filed its motion for summary judgment (first motion for summary judgment). Concurrently, the County filed an *ex parte* motion for an order shortening time for the hearing on the first motion for summary judgment (motion to shorten time), attempting to have the legality of the Charter Amendment decided before the general election. The circuit court denied the motion to shorten time; however, it set the hearing on the first motion for summary judgement for November 22, 2004.[3]

On November 10, 2004, the County filed its first amended complaint for declaratory relief, specifically naming the Defendants and seeking a declaratory judgment that the now-approved Charter Amendment was void. The first amended complaint sought both declaratory and injunctive relief and, like the initial complaint, alleged that the Charter Amendment: (1) violated article VIII, section 3 of the Hawai'i Constitution; (2) was void under article XXII, section 22.02, of the RCCK; and (3) was void for vagueness. Specifically, the first amended complaint alleged in pertinent part:

> 2. This [c]ourt has jurisdiction over the claims set forth in this complaint pursuant to [HRS] §§ 603–21.5 [ (Supp.2004) [4]], 603–23 [ (Supp.2004), quoted *infra,*] and 632–1 [ (1993), quoted *infra* ].
>
> 3. This [c]ourt is authorized to order declaratory relief pursuant to HRS § 632–1 and Hawai'i Rules of Civil Procedure Rule 57.
>
> 4. Petitioner COUNTY at all times mentioned herein was and is a governmental entity duly organized and existing under and by virtue of the laws of the State of Hawai'i. Lani D.H. Nakazawa is the

duly appointed County Attorney and has the authority, pursuant to HRS § 603–23 to bring this action.

. . . .

*FACTUAL ALLEGATIONS*

. . . .

> 17. Although styled as an amendment to the Charter itself, the Charter Amendment is in fact an attempt to amend the existing *ordinances* of the County which govern the assessment of real property. This is prohibited by Section 22.02 of Article XXII of the Charter.
>
> . . . .
>
> 19. The Hawai'i State Constitution, Article VIII, section 3, reserves the taxing power to the State and delegates the real property tax function to the counties. An initiative cannot authorize, repeal, or otherwise affect the real property taxing power of the County because this power is reserved to the county government, and cannot be further delegated through an initiative.
>
> 20. The intent of Article VIII, section 3 of the Hawai'i State Constitution is specifically to delegate the real property tax function to the county councils because the county councils are in a better position to administer local affairs.
>
> 21. The Charter Amendment violates Article VIII, section 3 of the Hawai'i State Constitution.
>
> 22. HRS § 50–15 [ (1993) ] provides that there is expressly reserved to the State Legislature the power to enact all laws of general application through the State on matters relating to the fiscal powers of the counties (except as delegated to the counties), and neither a charter or

---

**3.** Because there was no effective date set forth in the proposed Charter Amendment, the amendment, if approved, would become effective thirty days after November 2, 2004 in accordance with the RCCK. Thus, the November 22, 2004 hearing date provided the County with the opportunity for timely relief if the Charter Amendment should be approved. However, the subsequent voter approval of the Charter Amendment required the County to amend its complaint and withdraw its then-moot first motion for summary

judgment. Consequently, a hearing on the first motion for summary judgment never occurred.

**4.** HRS § 603–21.5(a)(3) states in pertinent part that "[t]he several circuit courts shall have jurisdiction, except as otherwise expressly provided by statute, of . . . [c]ivil actions and proceedings, in addition to those listed in sections 603–21.6, 603–21.7, and 603–21.8."

ordinance adopted under a charter shall be in conflict therewith.

23. The Charter Amendment violates HRS § 50–15.[5]

24. Because the Charter Amendment is unconstitutional pursuant to the Hawai'i State Constitution and violates HRS § 50–[15], the County seeks an appropriate declaratory judgment determining the proposed Charter Amendment to be invalid.

(Emphasis in original.)

## D. The Intervenors

On November 15, 2004, the Appellants moved to intervene, initially on behalf of Ohana Kaua'i, alleging that Ohana Kaua'i was the "moving force" behind the effort to put the Charter Amendment on the ballot and, thus, had an interest in the subject of the action. On the same day, the Appellants, referring to themselves as the "proposed intervenors," filed a motion to dismiss the initial complaint for declaratory relief (the first motion to dismiss). A hearing was held on the motion to intervene on November 22, 2004, at which time the circuit court ruled that Ohana Kaua'i did not have standing to intervene in this matter; however, the circuit court directed the Appellants to file an amended motion to intervene as individuals.[6] Pursuant to the court's instructions, the Appellants, in their individual capacities, filed an amended motion to intervene on December 6, 2004. On December 9, 2004, the circuit court denied the Appellants' first motion to dismiss as premature, citing the fact that it had yet to grant the Appellants' motion to intervene.

On January 5, 2005, the circuit court granted the Appellants' amended motion to intervene as individuals. Thereafter, on January 13, 2005, the Appellants filed their answer to the first amended complaint, asserting in relevant part that: (1) the first amended complaint is barred by the doctrine of laches; (2) the County lacked standing; (3) "the first amended complaint is barred by the lack of any content and/or justiciable controversy between the [County] and the Defendants"; (4) the Charter Amendment "lawfully amends the [RCCK]"; and (5) the Charter Amendment does not violate article VIII, section 3 of the Hawai'i Constitution.[7]

## E. The Substantive Motions

### 1. The Appellants' Second Motion to Dismiss

On January 20, 2005, the Appellants again moved to dismiss the first amended complaint (the second motion to dismiss). The Appellants specifically contended, *inter alia,* that:

In this case, the First Amended Complaint for Declaratory Relief must be dismissed for lack of subject matter jurisdiction. Simply put, there is no justiciable controversy between *adverse* parties in this case, and the [County] lacks standing to pursue these issues. Moreover, the issues are *not* ripe for adjudication[.]

(Emphases in original.) On March 4, 2005, the circuit court denied the Appellants' second motion to dismiss, concluding that: (1) HRS § 603–23, quoted *infra,* provided subject matter jurisdiction; (2) there was no challenge to an election process;[8] (3) there was a case in controversy; and (4) the County had standing.

---

5. Other than the allegations in 22, 23, and 24, HRS § 50–15 was not the subject of any motion by the parties and, therefore, was never considered by the circuit court. Consequently, the application of HRS § 50–15 will not be considered here on appeal. *See Survivors of Young v. Island Feeling, Inc.,* 109 Hawai'i 255, 256 n. 1, 125 P.3d 476, 477 n. 1 (2005) (an appellate court will not consider an issue not raised below unless justice so requires).

6. The Charter Amendment was due to become effective on December 2, 2004. *See supra* note 3.

7. The Defendants filed their answer to the County's first amended complaint on February 8, 2005, praying only that the circuit court "declare judgment on the validity of the Charter Amendment or invalidity thereof[.]"

8. The Appellants argued before the circuit court that "[t]he [c]ourt lack[ed] jurisdiction over the subject matter, as original jurisdiction of a ballot and/or election contest is with the Hawaii Supreme Court pursuant to HRS [§ ]11–171 (1993), *et. seq.*" The Appellants, however, do not challenge the circuit court's specific ruling on this issue.

### 2. The County's Motions for Summary Judgment

As previously noted, the County's first motion for summary judgment was withdrawn after the proposed Charter Amendment was approved by the voters. *See supra* note 3. Thereafter, on November 10, 2004, the County filed its first amended complaint. On November 23, 2004, the County filed a motion for preliminary injunction, seeking to enjoin the Defendants from implementing the newly approved Charter Amendment, which was to become effective on December 2, 2004.[9]

On December 30, 2004, the County filed its second motion for summary judgment "on the ground that the Charter Amendment is unconstitutional, violates the [RCCK], and impermissibly usurps the taxing authority of the County Council." Additionally, the County maintained, *inter alia*, that "[t]he Charter Amendment also fails because it is void for vagueness."

On January 19, 2005, the Appellants filed their memorandum in opposition to the County's second motion for summary judgment, arguing in relevant part that the Charter Amendment: (1) is not in violation of the Hawai'i Constitution; (2) is not an ordinance and that it merely "caps" real property taxes; and (3) is not vague or substantially incomprehensible.

In granting summary judgment in favor of the County, the circuit court concluded that the Charter Amendment violated article VIII, section 3 of the Hawai'i Constitution and was void under the RCCK; the circuit court did not reach the vagueness issue. Final judgment was entered on May 20, 2005. On June 9, 2005, the Appellants timely appealed.

### F. *The Appeal*

On September 29, 2005, a motion for leave to file an amicus curiae brief was filed by the Reason Foundation, Americans for Tax Reform, Americans for Prosperity, and National Taxpayers Union, which this court granted. Essentially, Reason Foundation, *et. al,* support the Appellants' position and urge this court to reverse the circuit court's judgment. On December 6, 2005, the Hawai'i Government Employees Association (HGEA) sought and· was also granted leave to submit an amicus curiae brief. Supporting the position taken by the County, the HGEA urges this court to affirm the circuit court's determination that the Charter Amendment is void. Subsequent to this court's designation of this case for no oral argument on October 2, 2006, the Appellants filed a motion for retention of oral argument on October 11, 2006, which was granted on October 26, 2006. Oral argument was held on February 15, 2007.

## II. STANDARDS OF REVIEW

### A. *Motion to Dismiss*

■ A circuit court's ruling on a motion to dismiss is reviewed *de novo. Wright v. Home Depot U.S.A., Inc.,* 111 Hawai'i 401, 406–07, 142 P.3d 265, 270–71 (2006).

A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim that would entitle him or her to relief. [This court] must therefore view a plaintiff's complaint in a light most favorable to him or her in order to determine whether the allegations contained therein could warrant relief under any alternative theory. For this reason, in reviewing [a] circuit court's order dismissing [a] complaint ... [this court's] consideration is strictly limited to the allegations of the complaint, and [this court] must deem those allegations to be true.

*In re Estate of Rogers,* 103 Hawai'i 275, 280–81, 81 P.3d 1190, 1195–96 (2003) (citations omitted) (some brackets and ellipsis in original) (some brackets added).

### B. *Standing*

■ Whether the circuit court has jurisdiction to hear the plaintiffs' complaint presents a question of law reviewable *de novo.* A plaintiff without standing is not entitled to invoke a court's jurisdiction.

9. Finding no exigent circumstances, the circuit court denied the County's motion for preliminary injunction on March 15, 2005. The circuit court's denial is not challenged on appeal.

Thus, the issue of standing is reviewed *de novo* on appeal.

*Mottl v. Miyahira,* 95 Hawai'i 381, 388, 23 P.3d 716, 723 (2001) (citations omitted).

#### C. *Motion for Summary Judgment*

■ This court reviews the circuit court's grant or denial of summary judgment *de novo. Yamagata v. State Farm Mut. Auto. Ins. Co.,* 107 Hawai'i 227, 229, 112 P.3d 713, 715 (2005) (citation omitted). The standard of review regarding a grant of summary judgment is well established:

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, [this court] must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Querubin v. Thronas,* 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005) (some brackets in original) (some brackets added) (citations omitted).

#### D. *Questions of Constitutional Law*

■ "We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case. Thus, we review questions of constitutional law under the 'right/wrong' standard." *City & County of Honolulu v. Sherman,* 110 Hawai'i 39, 49, 129 P.3d 542, 552 (2006) (internal quotations marks, ellipsis, and citation omitted).

### III. *DISCUSSION*

#### A. *Whether the Circuit Court Erred in Denying the Appellants' Second Motion to Dismiss*

##### 1. **Subject Matter Jurisdiction**

The Appellants contend that the circuit court erred in not dismissing the County's first amended complaint for lack of "subject matter" jurisdiction. The County, however, essentially points out that the Appellants have failed to recognize the distinction between subject matter jurisdiction and other competency doctrines. The County maintains that subject matter jurisdiction is conferred by the constitution and statutes and relates to the power of the court to adjudicate the issue. Subject matter jurisdiction, the County urges, does not depend on the particular parties in the case or the manner in which they have stated their claims, nor does it depend on the correctness of any decision made by the court. The County believes that there is no real dispute regarding whether the circuit court had subject matter jurisdiction because, in its view, they all agree that the court exercised subject matter jurisdiction pursuant to HRS § 603–23. The Appellants, however, do not agree.

■ "Jurisdiction is the base requirement for any court resolving a dispute because without jurisdiction, the court has no authority to consider the case. A court has subject matter jurisdiction if it is vested with the power to hear a case." *State v. Kaluna,* 106 Hawai'i 198, 203, 103 P.3d 358, 363 (2004). As previously stated, the County alleged in its first amended complaint that the circuit court had "jurisdiction over the claims set forth in this complaint pursuant to HRS §§ 603–21.5, 603–23[,] and 632–1." In denying the Appellants' second motion to dismiss, the circuit court specifically ruled, *inter alia,* that "[HRS] § 603–23[, entitled *Injunction of violation of laws and ordinances,*] gives the [c]ourt subject matter jurisdiction in this case."

■ HRS § 603–23 states:

> The circuit courts shall have power to enjoin or prohibit any violation of the laws of the State, or of the ordinances of the various counties, upon application of the attorney general, the director of commerce and consumer affairs, or the various county attorneys, corporation counsels, or prosecuting attorneys, even if a criminal penalty is provided for violation of the laws or

ordinances. Nothing herein limits the powers elsewhere conferred on circuit courts.

In *Kaluna,* this court stated:

> HRS § 603-23 *is not a jurisdiction-conferring statute, but merely authorizes **the circuit courts** to act in equity, affording injunctive relief, provided there is a jurisdictional basis for equity to act.* Even if the circuit court may have had the power to grant the remedy sought by the [plaintiff], it [ (*i.e.,* the court) ] still needed *an independent jurisdictional basis* to entertain the motion. Therefore, HRS § 603-23 did not provide the court with subject matter jurisdiction.

106 Hawai'i at 204, 103 P.3d at 364 (internal quotation marks and citation omitted) (emphases added). In the instant case, we believe that, to the extent the circuit court's written order denying the Appellants' second motion to dismiss demonstrates the circuit court's belief that HRS § 603-23 *alone* confers jurisdiction, the circuit court erred. However, as indicated above, the County's first amended complaint asserted jurisdiction pursuant to HRS § 603-21.5, quoted *supra* note 4, which provides the "independent jurisdictional basis" required by *Kaluna. See State ex rel. Bronster v. Yoshina,* 84 Hawai'i 179, 184, 932 P.2d 316, 321 (1997) (stating that the circuit court had jurisdiction pursuant to HRS § 603-21.5 to consider attorney general's request for declaratory relief brought pursuant to HRS § 603-23). We, therefore, hold that the circuit court had subject matter jurisdiction over this case.

### 2. Standing

 This court has stated:

> Standing is that aspect of justiciability focusing on the party seeking a forum rather than on the issues he wants adjudicated. And the crucial inquiry in its determination is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of the court's jurisdiction and to justify the exercise of the court's remedial powers on his behalf.

*Life of the Land v. Land Use Comm'n,* 63 Haw. 166, 172, 623 P.2d 431, 438 (1981) (internal quotation marks, brackets, emphasis, and citation omitted).

> In deciding whether the plaintiff has the requisite interest in the outcome of the litigation, [this court] employ[s] a three-part test: (1) has the plaintiff suffered an actual or threatened injury as a result of the defendant's wrongful conduct; (2) is the injury fairly traceable to the defendant's actions; and (3) would a favorable decision likely provide relief for plaintiff's injury.

*Mottl v. Miyahira,* 95 Hawai'i 381, 389, 23 P.3d 716, 724 (2001) (citing *Bush v. Watson,* 81 Hawai'i 474, 479, 918 P.2d 1130, 1135 (1996)). Our case law indicates that "the requisite interest" may be the result of a defendant's infringement upon a plaintiff's personal or special interest that is separate and distinct from the traditional infringements of legal rights or privileges. *See, e.g., Dalton v. City & County of Honolulu,* 51 Haw. 400, 402-03, 462 P.2d 199, 202 (1969) (conferring standing upon neighboring landowners based on their interest in safeguarding scenic view, sense of space, and population density due to adjacent highrise development); *Life of the Land,* 63 Haw. at 176 n. 9, 623 P.2d at 440 n. 9 (conferring standing based upon plaintiffs' recreational use of rezoned land for "diving, swimming, hiking, camping, sightseeing, horseback riding, exploring, and hunting and for aesthetic, conservational, occupational, professional and academic pursuits"); and *Pele Defense Fund v. Paty,* 73 Haw. 578, 589-90, 837 P.2d 1247, 1256 (1992) (standing conferred upon native Hawaiian group based on transfer of public ceded lands that would impede its "customarily and traditionally exercised subsistence, cultural and religious practices" on such land). Moreover, the plaintiff bears the burden of satisfying all three prongs of the injury-in-fact test. *Sierra Club v. Hawai'i Tourism Auth.,* 100 Hawai'i 242, 250, 59 P.3d 877, 885 (2002).

On appeal, the Appellants contend that the County lacked standing because it "never articulated any injury in fact supposedly suffered by the County." At oral argument, Appellants' counsel vigorously argued that

the County lacked standing because it failed to allege a "distinct and palpable injury" in its first amended complaint. When the County's attorney was specifically asked by the court whether his reference to the Charter Amendment as "go[ing] to the budget" was "the injury," he responded that it was one of the injuries. And, when asked whether such injury was alleged in the complaint, the County's attorney indicated it was; however, he could not point to the specific allegation(s) contained therein.

A closer examination of the "First Amended Complaint for Declaratory Relief," filed November 10, 2004, reveals the following relevant allegations:

13. The **Council** is responsible for enacting ordinances respecting real property taxes and **is the entity which would adopt legislation to give effect to the Charter Amendment.**

14. The **Council** is also responsible for enacting an annual budget ordinance. Pursuant to Article III of the Charter, the Council "*shall* provide sufficient revenues to assure a balanced budget."

15. Pursuant to Article 6, § 5A–6.3(b) of the Kaua'i County Code, the **Council is** also **responsible for setting increases or decreases to the real property tax rates.**

. . . .

18. **The Charter Amendment** violates existing county ordinances relating to real property taxes and **usurps the real property tax rate setting function of the Council.**

19. The Hawaii State Constitution, Article VIII, section 3, reserves the taxing power to the State and delegates the real property tax function to the counties. An initiative cannot authorize, repeal, or otherwise affect the real property taxing power of the counties because this power is reserved to the County **councils,** and cannot be further delegated through an initiative.

20. The intent of Article VIII, section 3 of the Hawai'i State Constitution is specifically to delegate the real property tax function to the county councils because the county councils are in a better position to administer local affairs.

21. The Charter Amendment violates Article VIII, section 3 of the Hawai'i State Constitution.

(Bold emphases added.) (Italicized emphasis in original.) At the hearing before the circuit court, the County argued that

the setting of taxes is related to the overall budget process. It's a very complex process. It isn't a matter of balancing the budget. *It's a matter of the balancing of interest[s] and various factors that go into balancing the budget, [and] the various needs of the community that need to be taken into account.*

(Emphasis added.) In other words, if implemented, the Charter Amendment would result in the reduction in real property tax revenues that, in turn, would likely necessitate county budget adjustments that would affect services provided to the citizens of Kaua'i county.

We believe that the first amended complaint alleges a sufficient injury under our case law to confer standing—**BUT,** upon the *County Council.*[10] In fact, the Appellants

---

10. A review of other allegations in the first amended complaint lends support to the notion that, although naming "the County" as plaintiff, the major focus of the complaint is the injury to the County Council:

19. The Hawai'i State Constitution, Article VIII, section 3, reserves the taxing power to the State and delegates the real property tax function to the counties. An initiative cannot authorize, repeal, or otherwise affect *the real property taxing power of the counties because this power is reserved to the County councils* and cannot be further delegated through an initiative.

20. The intent of Article VIII, section 3 of the Hawai'i State Constitution is specifically to delegate the real property tax function to the county councils because the county councils are in a better position to administer local affairs.

. . . .

28. Because the Hawai'i State Constitution reserves the taxing power to the State and delegates the real property tax function to the County, an initiative or a charter amendment cannot authorize, repeal, or otherwise affect the real property taxing power of the County because *this power is reserved to the Council* and cannot be further delegated through an initiative.

29. Because the Charter Amendment attempts to *usurp the taxing power of the Council,* the Charter Amendment is invalid.

28

essentially recognize on appeal that the "harm[ ]" alleged in the first amended complaint "impact[s]" the County Council. Clearly, as the entity responsible for setting increases or decreases to the real property tax rates, *see* article 6, § 5A–6.3(b) of the Kaua'i County Code, the County Council has a "personal stake" in the outcome of this case. However, the instant declaratory action was not brought in the name of the County Council.

The Kaua'i County Council is the primary governing body of the County of Kaua'i, *cf. Bremner v. City & County of Honolulu*, 96 Hawai'i 134, 137, 28 P.3d 350, 353 (App.2001) (stating that the Honolulu City Council is the primary governing body for the City and County of Honolulu) and, pursuant to RCCK § 3.01, is the legislative branch of county government.[11] Pursuant to RCCK § 6.01, "[t]he executive power of the county shall be vested in and exercised by the executive branch, which shall be headed by the mayor[,]" who, pursuant to RCCK § 7.05, serves as the chief executive officer of the county.[12] The director of finance is a mayoral appointee, pursuant to RCCK § 10.02 and serves within the executive branch as "the chief accounting, fiscal and budget officer of the county[.]" RCCK § 10.04.[13]

▉ As previously stated, the instant case was brought by "the County."[14] The County, as an artificial entity, acts through the officers of its executive and legislative branches. *See City of Sequim v. Malkasian*, 157 Wash.2d 251, 138 P.3d 943, 951 (2006) (stating that the grant of power to a city governing body "means exclusively the mayor and the city council and not the elector-ate" (citations omitted)); *Ward v. Superior Court of the State of California for the County of Los Angeles*, 70 Cal.App.3d 23, 138 Cal.Rptr. 532, 537 (1977) (stating "county acts through its board of supervisors, its officers, and its employees, much as does a private corporation"); *cf. Oahu Plumbing & Sheet Metal, Ltd. v. Kona Constr., Inc.*, 60 Haw. 372, 376, 590 P.2d 570, 573 (1979) (stating corporation, as artificial entity, can act only through its agents). Thus, inasmuch as the County must act through either the executive branch, *i.e.*, the mayor, or the legislative branch, *i.e.*, the County Council, or both, it is clear from a plain reading of the allegations in the first amended complaint that the plaintiff-County has brought the instant case on behalf of the County Council. *See Bronster*, 84 Hawai'i at 185, 932 P.2d at 322 (stating that, "for purposes of this appeal, the fact that the attorney general brought this action in the name of the state rather than in the name of the governor represents a distinction without a difference"). Here, the specified injury, *i.e.*, the usurpation of taxing authority, is clearly to the County Council; and, as such, the County Council is the entity with the personal stake in the outcome of this case. *Akau v. Olohana Corp.*, 65 Haw. 383, 388, 652 P.2d 1130, 1134 (1982) (stating "the crucial inquiry in its determination [of standing] is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his[, her, or its] invocation of the court's jurisdiction and to justify exercise of the court's remedial powers on his[, her, or its] behalf" (quoting *Life of the Land*, 63 Haw. at 172, 623 P.2d at 438)

(Emphases added.)

11. As alleged in ¶ 7 of the first amended complaint, the County Council "is the legislative body of the County. The Council is charged with the responsibility for enacting ordinances, laws, rules and regulations regarding, among other things, taxation of real property in the County."

12. In ¶ 5 of the first amended complaint, the County alleges that, "[t]he Chief Executive Officer for the County, the Mayor is responsible for enforcement of the provisions of the [RCCK], the ordinances of the County and all applicable laws."

13. As alleged in ¶ 6 of the first amended complaint, "[t]he Finance Director is charged with the responsibility of operating and managing the real property tax functions as established by ordinance."

14. The first amended complaint alleges that "Plaintiff COUNTY at all times mentioned herein was and is a governmental entity duly organized and existing under and by virtue of the laws of the State of Hawai'i. Lani D. Nakazawa is the duly appointed County Attorney and has the authority, pursuant to HRS § 603–23 to bring this action." However, as previously discussed in section III.A.1., HRS § 603–23 is not a jurisdiction-conferring statute.

(internal quotation marks and brackets and emphasis in original omitted)).

Problematic, however, is the fact that the County Council is specifically named as a *defendant* in this case; consequently, the above construction leads to the conclusion that the County is, in essence, suing itself.[15] Accordingly, because a plaintiff must be adversarial to a defendant to create an actual case or controversy sufficient for a court to invoke jurisdiction, *State v. Fields,* 67 Haw. 268, 274, 686 P.2d 1379, 1385 (1984), an "actual controversy" does not exist between the plaintiff-County (acting on behalf of the County Council) and the defendant-County Council. *See also* HRS § 632-1.[16]

Consequently, it appears that the absence of a controversy would compel dismissal of the first amended complaint. The inquiry, however, does not end here in light of the County's assertions that (1) Appellant's intervention cured any defect and (2) that a sufficient controversy exists based upon the antagonistic legal duties of the parties. We address each assertion in turn.

a. *Whether intervention cures the defect*

The County asserts that any defects in controversy were cured by the Appellants' intervention which, thereafter, provided a genuine controversy. The County cites *City of Springfield v. Washington Public Power Supply System,* 752 F.2d 1423 (9th Cir.1985), in support of its assertion of cure. However, neither that case, nor the United States Supreme Court case that it relied upon for vitality, *Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), strictly stand for the proposition that the lack of an actual controversy can be cured by intervention.

In *Chadha,* an alien challenged the Immigration and Naturalization Service's (INS) action to deport him. During the pendency of the matter, the House of Representatives, pursuant to statute, formally intervened by resolution. The Supreme Court stated that, *"prior to Congress' intervention, there was adequate Art. III adverseness even though the only parties were the INS and Chadha."* *Chadha,* 462 U.S. at 939, 103 S.Ct. 2764 (emphasis added). Similarly, in *City of Springfield,* the city sought a declaration that it had the authority to enter into a billing arrangement with the Bonneville Power Administration. During the pendency of the matter, citizen consumers intervened. On appeal, the United States Court of Appeals for the Ninth Circuit held that, "[w]hile it appears to us *that there was a case or controversy at the outset,* the alternate position of the intervenor ... resolves any doubt on that point." *City of Springfield,* 752 F.2d at 1427 (emphasis added). Thus, the holding in *Chadha,* like that in *City of Springfield,* was that there was a controversy from the beginning of the proceedings, which intervention only strengthened.

"It is well settled that[,] since intervention contemplates an existing suit in a court of competent jurisdiction and because intervention is ancillary to the main cause of action, intervention will not be permitted to breathe life into a 'nonexistent' law suit." *Fuller v. Volk,* 351 F.2d 323, 328 (3d Cir.1965) (citations omitted); *see also Kilpatrick v. Kilpatrick,* 205 S.W.3d 690, 705 (Tex.App.2006) (stating that "intervention by one with standing does not retroactively cure a jurisdictional standing defect"); *Goto v. Dist. of Colum-*

---

15. The County cannot be deemed to be acting on behalf of the executive branch, *i.e.,* the mayor and the finance director, inasmuch as there is nothing in the first amended complaint that alleges an injury-in-fact as to the mayor and/or the finance director. Thus, their status as defendants is proper.

16. HRS § 632-1 provides:
Relief by declaratory judgment may be granted in civil cases *where an actual controversy exists* between contending parties, or where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary party who also has or asserts a concrete interest therein, and the court is satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding.

*bia Bd. of Zoning Adjustment,* 423 A.2d 917, 922 (D.C.1980) (stating "[a]s a rule, an intervenor joins a preexisting dispute and cannot cure a jurisdictional defect in the original case.... In other words, an intervenor cannot come into a case that is not really there." (Citations omitted.)). Thus, based on the foregoing, the County's argument is without merit.

#### b. *Antagonistic legal duties*

On appeal, the Appellants contend that "there is no actual controversy[,] and the County Attorney, the Mayor, the Finance Director, and the County Council are not adversaries or contending parties with antagonistic claims." (Some initial capitalization and internal quotation marks omitted.) As such, the Appellants characterize the County's first amended complaint as "collusive" in nature. In response, the County essentially maintains that a sufficient controversy existed based upon the antagonistic legal duties of the parties.

■ As previously stated, a plaintiff must be adversarial to a defendant to create an actual case or controversy sufficient for a court to invoke jurisdiction. *See Fields,* 67 Haw. at 274, 686 P.2d at 1385.

As to the controversy, this court has observed that[, alt]hough the courts of Hawai'i are not subject to a "cases or controversies" limitation like that imposed upon the federal judiciary by Article III, [section] 2 of the United States Constitution, [this court] nevertheless believe[s] judicial power to resolve public disputes in a system of government where there is a separation of powers should be limited to those questions capable of judicial resolution and presented in an adversary context.... In short, judicial intervention in a dispute is normally contingent upon the presence of a "justiciable" controversy.

*Life of the Land,* 63 Haw. at 171–72, 623 P.2d at 438 (citations omitted). Furthermore, "an action not founded upon an actual controversy between the parties to it, and brought for the purpose of securing a determination of a point of law, is collusive and will not be entertained[.]" *State v. Hoang,* 93 Hawai'i

333, 336, 3 P.3d 499, 502 (2000) (citing *Reynolds v. Van Culin,* 36 Haw. 556 (1943)).

In *Reynolds,* two business associates, among others, were involved in an automobile accident. 36 Haw. at 556. One sent a letter to the other, stating:

I want to remind you again that we do not propose to look to you for the satisfaction of any judgment. The only way that we can proceed against the insurance company under the ... policy is to sue you, obtain judgment and then sue the insurance company under the policy, alleging and proving that you were driving the car for the [policy holders] at the time [of the accident].

*Id.* at 559. The defendant who received the letter offered it as evidence of "collusion," urging that an action "brought on pretense of a controversy which does not exist" is not justiciable. *Id.* at 560. This court held that, despite the subjective desires of the parties, their legal interests and duties created an actual controversy. *Id.*

The *Reynolds* court relied on *Golden Gate Bridge & Highway District v. Felt,* 214 Cal. 308, 5 P.2d 585 (1931), involving real property taxpayers in California who were opposed to the establishment of county districts and the resulting taxation. *Id.* at 588. One district adopted plans to build a bridge across the Golden Gate between San Francisco and Marin County and attempted to issue bonds to raise money for construction. *Id.* at 589. When the district secretary refused to sign the bonds, asserting they were invalid under state law, the district brought a suit to compel issuance of the bonds. *Id.* The issue at trial was the validity of the bonds. Amicus curiae briefs on behalf of taxpayers were filed as reflecting the public's interest. *Id.* at 589. It was conceded that the district secretary-defendant personally desired the bonds to be found valid and was thus subjectively on the side of the petitioner. *Id.* Moreover, the court observed that the petitioner and bridge contractors had agreed to reimburse the district secretary-defendant for his litigation expenses. *Id.* Thus, the amicus taxpayers argued that there was no actual controversy and that the suit was a collusive, "friendly" suit. *Id.* at 589. The California

Supreme Court, however, apparently found the argument unavailing and held that "[a] genuine controversy existed ... between petitioner and [defendant] as to matters vitally affecting [their] duties.... The personal desires of the parties as to the result of the litigation are of no moment[.]" *Id.* at 590. Consequently, the court in *Golden Gate Bridge*—as did this court in *Reynolds*—held that, despite the subjective desires of the parties involved, it is their legal interests and duties that are to be considered when determining whether a suit is adversarial and, thus, not collusive for purposes of justiciability. *Golden Gate Bridge* 5 P.2d at 590; *Reynolds*, 36 Haw. at 566.

■ Here, the Appellants argue that the Defendants "were not actually adversarial to the lawsuit, but in fact supported it wholeheartedly." In support of their position that no actual controversy existed, the Appellants point to the facts that (1) the County Attorney and the Defendants jointly issued a press release, expressing their serious doubts as to the Charter Amendment's validity and also placed a newspaper advertisement urging a "no" vote on the Charter Amendment, (2) the Defendants were themselves represented by a Deputy County Attorney, and (3) the County Attorney's duties reflected that she also represented the Defendants in their official capacities.[17]

The County, on the other hand, argues that:

The uncertainty [over the validity of the Charter Amendment] had the consequence to the Kaua'i County Officials in that they are legally charged with implementation of the Charter Amendment. The Kaua'i County Officials therefore had concrete interests in the validity or invalidity of the Charter Amendment.

The Mayor heads the executive branch of Kaua'i County. RCCK § 6.01. He is its chief executive officer, exercises direct supervision over all departments and submits operating and capital budgets to the Council. RCCK § 7.05. The Director is the chief accounting, fiscal and budget offi-

**17.** In attempting to establish the nonexistence of a controversy, the Appellants raise the "dual representation of all parties by the County Attorney," arguing that "either the County Attorney is enmeshed in an insoluble conflict of interest, or there is no conflict resulting from simultaneously serving as counsel for both the plaintiff and the defendants because the parties are not directly adverse but share a singularity of purpose and interest." (Citation and footnote omitted.) However, as the County correctly points out, the

> Appellants' argument that an insoluble conflict of interest under Hawai'i Rules of Professional Conduct ("HRPC") Rule 1.7(a) is created through concurrent representation ... was not raised before the [c]ircuit [c]ourt....
> ... [Nevertheless, there is] a well-established distinction between private attorneys representing private parties and government attorneys representing government entities. Hawai'i precedent is clear that "the ethical rules for private law firms are not necessarily applicable to government employees."

(Quoting *State v. Klattenhoff*, 71 Haw. 598, 604, 801 P.2d 548, 551 (1990) (internal quotation marks and citations omitted)).

In *Klattenhoff*, a case involving the state Attorney General (AG) defending Klattenhoff in civil actions filed against him and in prosecuting him in a criminal action, this court stated:

> [D]ue to the AG's statutorily mandated role in our legal system, we cannot mechanically apply the Code of Professional Responsibility to the AG's office.

> ....
> We recognize, as do the majority of states, that[,] due to the multiple duties statutorily imposed upon the AG's office, the ethical rules for private law firms are not necessarily applicable, in all cases, to the AG's office.
> The practical reality is that every employee, appointee or elected official in state government who may be advised by the AG, or receive some legal service from the AG[,] is a potential client of the AG. Thus, there is a potential conflict whenever the AG exercises his [or her] statutory duty to investigate and prosecute violations of state law committed by people in state service....
> We hold that the AG may represent a state employee in civil matters while investigating and prosecuting him in criminal matters, so long as the staff of the AG can be assigned in such a manner as to afford independent legal counsel and representation in the civil matter, and so long as such representation does not result in prejudice in the criminal matter to the person represented.

*Id.* at 603–05, 801 P.2d at 551–52 (citations omitted). As the counterpart to the state AG, the County attorney is also charged with representing "the county in all legal proceedings." RCCK § 8.04. Thus, as the County argues, concurrent representation by the County Attorney of county agencies in intra-government controversies is consistent with *Klattenhoff* and, therefore, proper, unless such representation results in prejudice, and none has been shown.

cer of Kaua'i County; he prepares the annual budget under the direction of the Mayor, and operates and manages the real property tax functions as established by ordinance. RCCK § 10.04. The Council exercises the legislative power of Kaua'i County. RCCK § 3.01. The Council also enacts the annual budget ordinance and · must finance and balance the same by ensuring sufficient revenues. RCCK § 3.10.

The Kaua'i County Officials have no discretion as to their duties to implement valid laws of the jurisdiction, regardless of their personal views. Their legal interests and responsibilities were irreconcilable with the apparent invalidity of the Charter Amendment, and thus an actual controversy existed.

. . . The County clearly had an interest in determining the validity of amendments to its Charter. On the other hand, the legal duties of the Kaua'i County Officials to implement the Charter Amendment, regardless of its validity, were at odds with the legal interests of the County. Given the uncertainty and controversy, it was wholly appropriate for the validity of the Charter Amendment to be judicially resolved.

In *United Public Workers, AFSCME, Local 646, AFL–CIO v. Yogi*, 101 Hawai'i 46, 62 P.3d 189 (2002), this court, in deciding that the plaintiffs-appellees/cross-appellants' claim for declaratory relief was not moot because a substantial controversy remained in the case, stated:

In the words of HRS § 632–1, the dispositive question is whether the court is satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding. This is a question of law. In determining whether parties still retain sufficient interests and injury as to justify the award of declaratory relief, *the question is whether the facts alleged, under all circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to* warrant *a declaratory judgment.*

*Id.* at 57, 62 P.3d at 198 (internal brackets, quotation marks, and citations omitted) (emphasis added).[18] *Yogi* is consistent with the principles in *Reynolds* and *Golden Gate Bridge*, discussed *supra*. In other words, despite the subjective desires of the original parties to this action, it is their legal interests and duties that are to be considered when determining whether a suit is adversarial and, thus, not collusive for purposes of justiciability, *i.e.*, standing.

■ However, as previously discussed in section III.A.2., the presence of the County Council as a defendant in this case destroys the existence of an actual controversy because, at least as between the plaintiff-County, acting on behalf of the County Council, and the defendant-County Council itself, their legal interests and duties are identical. Had the County Council *not* been named as a defendant, then the legal interests and duties between the County, acting on behalf of the County Council, as plaintiff, and the Mayor and Finance Director as defendants would be adversarial. In other words, the legal duty of the plaintiff-County, acting on behalf of the County Council, to protect against the Charter Amendment's usurpation of the Council's taxing authority would be adverse to the executive branch officers' legal duties

---

**18.** This court has repeatedly stated that, "for purposes of establishing standing in an action for declaratory relief, HRS § 632–1 interposes less stringent requirements for access and participation in the court process." *Citizens for the Prot. of the N. Kohala Coastline v. County of Hawai'i*, 91 Hawai'i 94, 100, 979 P.2d 1120, 1126 (1999) (citing *Richard v. Metcalf*, 82 Hawai'i 249, 921 P.2d 169 (1996)); *see also Bremner v. City & County of Honolulu*, 96 Hawai'i 134, 141, 28 P.3d 350, 357 (2001) (same); *Mottl v. Miyahira*, 95 Hawai'i 381, 389, 23 P.3d 716, 724 (2001) (same). This court explained in *Richard* that:

Although HRS § 632–1 provides for standing to sue "[i]n cases of actual controversy," HRS § 632–6 clarifies that

[the] purpose [of HRS chapter 632] is to afford relief . . . without requiring one of the parties interested so to invade the rights asserted by the other as to entitle the party to maintain an ordinary action therefor. *It is to be liberally interpreted and administered, with a view to making the courts more serviceable to the people.*

*Id.* at 254 n. 12, 921 P.2d at 174 n. 12 (emphasis added) (citation omitted).

to enforce the Charter Amendment. Thus, the question arises whether it is appropriate, at this stage of the proceeding, for this court to "drop," *i.e.*, dismiss, the County Council to cure the "spoiler" problem, which we next examine.

### c. *Misjoinder of parties*

██ Hawai'i Rules of Civil Procedure (HRCP) Rule 21 (2004) provides:

Misjoinder of parties is not ground for dismissal of an action. *Parties may be dropped* or added *by order of the court* on motion of any party or *of its own initiative at any stage of the action and on such terms as are just.* Any claim against a party may be severed and proceeded with separately by order of the court.

(Emphases added.) In *Kawamata Farms, Inc. v. United Agri Products*, 86 Hawai'i 214, 948 P.2d 1055 (1997), this court stated that "[a] circuit court has the discretion to realign the parties at any stage of the action and on such terms as are just." *Id.* at 244, 948 P.2d at 1085 (citation omitted). However, *Kawamata Farms'* reference to the circuit court's discretion was in the context of the appropriate number of peremptory challenges to be allocated to the parties at trial and, thus, provides little guidance with respect to the circumstances we have here. Nevertheless, inasmuch as HRCP Rule 21 is identical to Federal Rules of Civil Procedure (FRCP) Rule 21, we look to federal cases for guidance. *See Pulawa v. GTE Hawaiian Tel*, 112 Hawai'i 3, 20 n. 15, 143 P.3d 1205, 1222 n. 15 (2006) (noting that, "[w]here a Hawai'i rule of civil procedure is identical to the federal rule, the interpretation of [that] rule by [the] federal courts is highly persuasive" (citation omitted)).

The historical purpose of FRCP Rule 21 was to "provide[ ] the courts with a valuable procedural device that can be used to avoid multiple litigation and to promote liberal joinder of parties." 7 C. Wright and A. Miller, Federal Practice and Procedure, § 1681 at 473 (3d ed.2001). As explained by the United States District Court for the District of Minnesota in *Stark v. Independent School District # 640*, 163 F.R.D. 557 (D.Minn.1995), wherein it examined the interplay between FRCP Rules 19 (relating to joinders), 20 (allowing separate trials on separate claims), and 21 (misjoinder and nonjoinder of parties):

[T]he underlying purpose of Rules 19, 20 and 21 is to allow the district court itself to exercise its power *to align the parties and the issues presented in a single lawsuit in a way that will foster judicial efficiency, while protecting against prejudice.*

The [r]ules seek to preserve the autonomy of the parties, but that goal is not without limits. Rule 19 serves to insure the presence of an "essential core" of parties and issues, to avoid multiplicity of suits. Rule 20 permits the Court to add parties but to avoid unduly complicating the proceeding. Rule 21 serves both functions. *The duty of the Court in considering a motion to add or drop a party is to strike a balance among these competing considerations, while following the initial mandate "to secure the just, speedy and inexpensive determination of every action."*

*Id.* at 564 (emphases added) (citations and footnote omitted).

In *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989), *superseded by statute on other grounds* in *Singh v. Daimler–Benz AG*, 9 F.3d 303, 311 (3d Cir.1993), the United States Supreme Court observed that "Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time, even after judgment has been rendered." *Id.* at 832, 109 S.Ct. 2218 (footnote omitted); *see also Safeco Ins. Co. v. City of White House, Tennessee*, 36 F.3d 540, 545 (6th Cir.1994) (same). Based on such observation, the Court examined "whether a court of appeals may do what a district court can do and dismiss a dispensable nondiverse party itself, or whether a court of appeal must remand the case to the district court, leaving it to the district court's discretion to dismiss the party[.]" [19] *New-*

---

19. In *Newman–Green,* the Supreme Court reviewed a reversal by the United States District Court of Appeals for the Seventh Circuit (sitting *en banc* ) of the Seventh Circuit panel's dismissal

*man–Green,* 490 U.S. at 832–33, 109 S.Ct. 2218.

In answering the inquiry, the Court stated that "[a]lmost every modern [c]ourt of appeals faced with this issue has concluded that it has the authority to dismiss a dispensable nondiverse party by virtue of Rule 21," *id.* at 833, 109 S.Ct. 2218, noting that "[t]he cases holding that appellate courts are powerless to remedy such jurisdictional defects are few and far between." *Id.* at 833 n. 7, 109 S.Ct. 2218 (citations omitted). The Court, pointing to its decision in *Mullaney v. Anderson,* 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458 (1952), further stated that,

> [a]lthough we did not discuss extensively Rule 21's applicability in the appellate setting, we did note that *the change in the parties would not have* "*affected the course of the litigation*" *if it had occurred at some earlier point,* and would not "embarrass the defendant[ ]" [and that] *dismissing the petition and thereby requiring the plaintiffs to start over in the District Court* "*would entail needless waste and runs counter to effective judicial administration.*"

*Id.* at 833, 109 S.Ct. 2218 (quoting *Mullaney,* 342 U.S. at 417, 72 S.Ct. 428) (emphases added). In holding that appellate courts have the authority to dismiss a dispensable nondiverse party, the Court emphasized that "the appellate court should carefully consider whether the dismissal ... will prejudice any of the parties in the litigation." *Id.* at 838, 109 S.Ct. 2218.

Acknowledging that the dismissal of the nondiverse dispensable party in *Mullaney* "represented the exercise of an appellate power that long predates the enactment of the [FRCP]," *id.* at 834, 109 S.Ct. 2218, the Court in *Newman–Green* discussed several 19th-century cases generally dealing with the amendment power of the appellate courts. In so doing, the Court observed:

> Although these 19th-century cases were decided in a procedural era different from our own, it is apparent that the weight of authority favored the view that appellate courts possessed the authority to grant

motions to dismiss dispensable nondiverse parties. Courts relied then on § 32 of the Judiciary Act of 1789 or on the inherent power of appellate courts. Today courts rely on *Mullaney* or Federal Rule 21. We decline to disturb that deeply rooted understanding of appellate power, *particularly when requiring dismissal after years of . litigation would impose unnecessary and wasteful burdens on the parties, judges, and other litigants waiting for judicial attention.* Appellate-level amendments to correct jurisdictional defects may not be the most intellectually satisfying approach to the spoiler problem, but ..., *because* "*law is an instrument of governance rather than a hymn to intellectual beauty, some consideration must be given to practicalities.*"

*Id.* at 836–37, 109 S.Ct. 2218 (emphases added) (footnotes and citations omitted). Concluding that the practicalities of the case before it weighed heavily in favor of dismissing the nondiverse dispensable party, the Court stated that parties "should not be compelled to jump through ... judicial hoops merely for the sake of hypertechnical jurisdictional purity." *Id.* at 837, 109 S.Ct. 2218.

The Supreme Court's holding that appellate courts have the same authority as the district courts to dismiss a party from the suit under FRCP Rule 21 is consistent with Hawaiʻi Rules of Appellate Procedure (HRAP) Rule 2.1. HRAP Rule 2.1(a), entitled "Applicability of other court rules," provides that "the Hawaiʻi Rules of Civil Procedure [ (and other court rules) ] that may be adopted by the supreme court from time to time are hereby adopted as part of these rules whenever applicable." In other words, HRCP Rule 21's authority that "[p]arties may be dropped ... by order of the court ... of its own initiative at any stage of the action and on such terms as are just" is granted to the supreme court via HRAP Rule 2.1 "whenever applicable." *See also* HRCP Rule 81(i) (providing that the HRCP "shall apply ... to all appeals to the appellate courts in all actions and proceedings of a civil nature").

---

of a certain United States citizen from the lawsuit because the individual's presence in the suit

destroyed diversity jurisdiction. *Id.* at 829, 109 S.Ct. 2218.

In the case at bar and as previously discussed in section III.A.2., plaintiff-County, by asserting that the Charter Amendment usurps the taxing authority of the County Council, has asserted an injury on behalf of the Council. A review of the first amended complaint clearly demonstrates that the entity identified as having been injured throughout the complaint is the County Council. Thus, by dropping the County Council as a defendant an actual controversy exists.

The first amended complaint clearly put the parties, including the Appellants, on notice with respect to the alleged injury, *i.e.*, usurpation of the County Council's taxing authority, and called into question the validity of the Charter Amendment. *See In re Genesys Data Technologies, Incorporated v. Meindl*, 95 Hawai'i 33, 41, 18 P.3d 895, 903 (2001) (stating that "Hawaii's rules of notice pleading require that a complaint set forth a short and plain statement of the claim that provides defendant with fair notice of what the plaintiff's claim is and the grounds upon which the claim rests" (citations omitted)). Moreover, all of the parties' legal arguments have been properly focused on the validity of the Charter Amendment. Thus, neither the remaining defendants (the Mayor and Finance Director) nor the intervenor-appellants would be prejudiced by dropping the County Council as a defendant. The County's position that the Charter Amendment is invalid because it usurps the County Council's taxing authority remains the position of the plaintiff-County as it alleged in the first amended complaint. In other words, "the change in the parties would not have affected the course of the litigation if [dropping of the dispensable party, *i.e.*, realignment] had occurred at some earlier point[.]" *Newman–Green*, 490 U.S. at 833, 109 S.Ct. 2218 (internal quotation marks omitted) (quoting *Mullaney*, 342 U.S. at 417, 72 S.Ct. 428).

Finally, dismissing the first amended complaint at this stage of the litigation, thereby requiring the County to start over in the circuit court "would entail needless waste and runs counter to effective judicial administration." *Newman–Green*, 490 U.S. at 833, 109 S.Ct. 2218 (citation omitted). If this court were to remand this case with instructions that the first amended complaint be dismissed, it is highly likely that the County will simply re-file its case with the proper alignment of parties and minimal revisions to its complaint. The focus will remain the validity of the Charter Amendment, which has already been extensively briefed; nothing will have changed, except for the absence of the County Council as a defendant.

Indeed, the *Newman–Green* Court instructs that, "because law is an instrument of governance ..., some consideration must be given to practicalities," 490 U.S. at 837, 109 S.Ct. 2218 (citation omitted), and that we should not compel litigants to jump through "judicial hoops merely for the sake of hypertechnical jurisdictional purity." *Id.* In our view, given the recent public interest in real property taxation and the likelihood of increased litigation regarding real property taxes, the just, speedy, and inexpensive determination of this case outweighs the hypertechnical pleading defect, *see Stark*, 163 F.R.D. at 564 (acknowledging district court's power to align parties and issues presented in a single lawsuit that will foster judicial efficiency, while protecting against prejudice),—especially in light of the fact that the first amended complaint properly asserts the requisite injury to the proper party with the personal stake in the outcome of the litigation, *i.e.*, the County Council.

We, therefore, dismiss the County Council as a dispensable defendant in this case.[20] In so doing, we hold that the plaintiff-County, acting on behalf of the County Council, has sufficiently alleged a threatened injury, *i.e.*, the usurpation of the Council's taxing authority. With respect to the second and third prongs of the injury-in-fact test, *see Akau*, 65 Haw. at 389, 652 P.2d at 1134–35, we hold that the County/Council's threatened injury is "fairly traceable," *id.*, to the Defendants' duty to enforce the Charter Amendment and that "a favorable decision," *id.*, *i.e.*, invalidating the Charter Amendment,

---

20. The dissent mischaracterizes our dismissal of the County Council as a dispensable defendant as substituting the County Council for the plaintiff-County. However, based on the foregoing discussion, the dissent is plainly wrong.

"would likely provide relief," *id.*, for the threatened injury.

Based on the foregoing, we hold that the plaintiff-County, acting on behalf of the County Council, has standing to maintain this action.[21]

### 3. Ripeness

The Appellants also assert that "this case is not ripe for review ... because the [D]efendants did nothing after the enactment of [the Charter Amendment] to implement it, and its mere enactment was not a 'violation of the law' contemplated by [HRS § ]603–23[.]" (Citing *City of Santa Monica v. Stewart*, 126 Cal.App.4th 43, 24 Cal.Rptr.3d 72, 90 (2005), for the proposition that a claim is not ripe when "judicial guidance" was sought on the constitutionality of a law that was not implemented.) The County, however, maintains that:

> In this case, the Charter Amendment was already enacted. There existed no method by which the Charter Amendment could be revised or its legal defects cured. If the Charter Amendment was invalid, it was so on its face. The question of the Charter Amendment's validity therefore ripened upon certification of the results of the election, if not sooner.

This court has stated that "ripeness is peculiarly a question of timing, and a ruling that an issue is not ripe ordinarily indicates the court has concluded a later decision may be more apt or that the matter is not yet appropriate for adjudication." *Convention Ctr. Auth. v. Anzai*, 78 Hawai'i 157, 162, 890 P.2d 1197, 1202 (1995) (internal quotation marks, elipses, brackets, and citations omitted).

█ Here, as the County points out, "[o]nce the election was certified, there remained no further action to be taken to enact the Charter Amendment or to implement its directives." Consequently, we believe that a later decision will not be "more apt." *Anzai*, 78 Hawai'i at 162, 890 P.2d at 1202. Based

upon the state of the record, we believe the validity of the Charter Amendment is "appropriate for adjudication." *Id.* Moreoever, we decline to address the applicability of *Stewart* to this case in light of the fact that the Appellants do not provide any argument as to why this court should follow California's two-part test to determine the ripeness of a case.

Accordingly, we hold that the circuit court did not err in denying the Appellants' second motion to dismiss the first amended complaint. We now turn to the Appellants' challenge to the circuit court's grant of summary judgment in favor of the County.

### B. Whether the Circuit Court Erred in Granting Summary Judgment in Favor of the County

On appeal, the Appellants contend that the circuit court erred in granting summary judgment in favor of the County on the bases that the Charter Amendment: (1) was void under the RCCK; and (2) violated article VIII, section 3 of the Hawai'i Constitution. We address each contention in turn.

### 1. Whether the Charter Amendment is Void under the RCCK

The Appellants contend that "[t]he circuit court wrongly concluded as a matter of law that [the Charter Amendment] is, in fact, a disguised initiative ordinance 'authorizing or repealing the levy of taxes.'" Relying on *Omaha National Bank v. Spire*, 223 Neb. 209, 389 N.W.2d 269 (1986), the Appellants assert that "[t]he procedure by which [the Charter Amendment] was incorporated into [the RCCK] is dispositive and must be respected." The Appellants argue that "[t]here is no dispute that [the Charter Amendment] was properly enacted in accordance with the [RCCK's] amendment process. This is conclusive of its character as a [c]harter amendment." (Citation omitted.) The Appellants further argue that:

> The circuit court wrongly determined without any evidence in the record that the

---

21. In light of our holding, we need not address the County's reliance on *Bronster* for the proposition that "standing should not serve as a barrier to consideration of cases of great public impor-

tance" nor its reliance on the "procedural standing doctrine" discussed in *Sierra Club v. Hawai'i Tourism Auth.*, 100 Hawai'i 242, 59 P.3d 877 (2002).

"intent" of the people of the County was to disguise an ordinance as a Charter provision. *See Lum Yip Kee, Ltd. v. City & County of Honolulu,* 70 Haw. 179, 187, 767 P.2d 815, 820 (1989) ("courts will not and cannot inquire into motives of members of a municipal governing body or other zoning authority where the validity of zoning plans or laws is under consideration"). With virtually no factual record before it ‛but the language of [the Charter Amendment], the circuit court should not have substituted its judgment about what the people of the County intended for the actual judgment of the people expressed in the [Charter Amendment].

(Footnote omitted.) Finally, the Appellants assert that "[c]harters are the organic documents of the counties—their 'constitutions'— and are the product of the people, not ordinary legislation such as ordinances, and the courts should not lightly abrogate them."

The County, on the other hand, contends that, "[i]rrespective of its title, the Charter Amendment is an impermissible initiative." The County argues that, "[i]n substance, the Charter Amendment creates at least two new classes of properties under Kaua'i County's existing real property tax scheme."

■ Initially, we acknowledge that, at oral argument, the County, through its attorney, conceded that the Charter Amendment was "valid," and, when specifically asked whether the County was withdrawing its argument that the Charter Amendment was a disguised ordinance, counsel replied, "Yes, to be candid, your Honor, as we see it today." However, the validity or invalidity of the Charter Amendment is a question of law for this court to decide. *See Yogi,* 101 Hawai'i at 63, 62 P.3d at 206 (stating that, where issues to be decided are questions of law, this court, as the court of last resort in this state, has responsibility to decide the issue); *see also McCandless v. Campbell,* 20 Haw. 404, 405 (1911) (concluding that, where a statement in question "is purely of a conclusion of law[, it] does not bind the court. If it becomes essential to a disposition of the appeal, the issue of the alleged unconstitutionality will be considered and decided.") Stated differently, this court is not bound by the County's conces-

sion of law. *F.A.C.E. Trading, Inc. v. Todd,* 393 Md. 364, 903 A.2d 348, 355 n. 7 (2006) (stating that the appellate court is not bound by a party's concession of law); *Bergmann v. McCaughtry,* 211 Wis.2d 1, 564 N.W.2d 712, 714 (1997) (same). Moreover, inasmuch as there is no dispute that the circuit court's voiding of the Charter Amendment was based upon its conclusion that the amendment was a disguised ordinance and the Appellants specifically challenge the circuit court's conclusion on appeal, we must examine whether the circuit court erred in so concluding, regardless of the County's representation at oral argument.

■ This court has previously stated that:

It is ... a fundamental tenet of municipal corporation law that a charter may not be amended except by properly initiated and enacted charter amendments. The City Council has no authority to amend the Revised Charter of the City and County of Honolulu [ (RCH) ]. *See* RCH, article XV. *See also* 5 McQuillin Mun. Corp. § 15.01[ ] at 50 [ (3d ed. 1989) ] (**"Whether a proposal is an ordinance or an amendment to the city charter must be determined from the substance of the proposal rather than its name"**); *State ex rel. Werner v. Koontz,* 153 Ohio St. 325, 91 N.E.2d 473 (1950) (footnote omitted) (**amending the charter "cannot be done with the guise of ... designating such proposed amendment as an ordinance"**).

*Fasi v. City Council of City & County of Honolulu,* 72 Haw. 513, 519, 823 P.2d 742, 744–45 (1992) (emphases added). In other words, the determination whether a proposal is an ordinance or an amendment to the city charter must be made by an examination of the substance and not the form of the proposal. *See Save Our Streets v. Mitchell,* 357 Md. 237, 743 A.2d 748, 755 (2000) (stating that the content of a charter amendment "cannot transcend its limited office and be made to serve or function as a vehicle through which to adopt local legislation"). Such an examination comports with this court's steadfast policy of refusing to "elevate form over substance." *Coon v. City & County of Honolulu,* 98 Hawai'i 233, 254, 47

P.3d 348, 369 (2002) (stating that "elevat[ing] form over substance" is an "approach we have repeatedly eschewed"). Although *Omaha National Bank*—the case relied on by the Appellants—stands for the proposition that "the deciding factor in determining whether a proposed initiative enactment is an amendment or a statute is the manner in which the proposal is denominated in the initiative petition submitted to the voters[,]" 389 N.W.2d at 275, such a position is inconsistent with our prior precedent and case law from other jurisdictions. We, therefore, decline to follow *Omaha National Bank*, as the Appellants urge on appeal. Consequently, the determination whether the Charter Amendment is a "disguised initiative ordinance" must be made by an examination of the substance and not the form of the proposal.

 Preliminarily, we note our agreement with the Maryland Court of Special Appeals, which recently observed that:

A charter "is, in effect, a local constitution." *Cheeks v. Cedlair Corp.*, 287 Md. 595, 606, 415 A.2d 255 (1980). It "provides a broad organizational framework establishing the form and structure of government in pursuance of which the political subdivision is to be governed and local laws enacted." *Id.* at 607, 415 A.2d 255. Its " 'basic function' . . . is 'to distribute power among the various agencies of government, and between the government and the people who have delegated that power to their government.' " *Save Our Streets v. Mitchell*, 357 Md. 237, 248, 743 A.2d 748 (2000) (citation omitted).

Consequently, it follows that an amendment to a charter "is necessarily limited in substance to amending the form or structure of government initially established by adoption of the charter." *Cheeks*, 287 Md. at 607, 415 A.2d 255. It may not "serve or function as a vehicle through which to adopt local legislation." *Id.* . . . .

*Mayor & City Council of Ocean City v. Bunting*, 168 Md.App. 134, 895 A.2d 1068, 1075 (2006) (brackets omitted) (first set of ellipses in original) (emphases added). Based on the foregoing principles, the Mary-

land Court of Special Appeals further observed that

. . . the [Maryland] Court of Appeals [ (Maryland's court of last resort) ] has invalidated proposed charter amendments, for being legislative in character, that would have established "a comprehensive system for regulating rents within the City's residential housing market," *Cheeks*, 287 Md. at 608, 415 A.2d 255; or created detailed procedures for arbitrating labor disputes involving county firefighters, *Griffith v. Wakefield*, 298 Md. 381, 470 A.2d 345 (1984); or prohibited the expenditure of county funds to install or maintain speed bumps as well as to remove them. *Save Our Streets*, 357 Md. 237, 743 A.2d 748. . . . **"It is common," the Court [of Appeals] explained, "for constitutions or charters to authorize, or preclude, specified types of enactments by legislative bodies."** [*Griffith*, 298 Md. at 389, 470 A.2d 345]. **"This is quite different," the Court [of Appeals] stressed, "from a charter itself containing all of the detailed provisions concerning the subject."** *Id.*

*Id.* (emphases added).

In *Board of Supervisors of Elections of Anne Arundel County v. Smallwood*, 327 Md. 220, 608 A.2d 1222 (1992) [hereinafter, *Smallwood*], the Maryland Court of Appeals (the court) considered the validity of certain proposed charter amendments that would have essentially limited property taxes in Baltimore and Anne Arundel Counties. The proposed charter amendments consisted of, *inter alia*, "roll-back" and "cap" provisions. Specifically,

[t]he roll-back provisions of the proposed [charter] amendments would have limited the amount of property tax revenues for the tax year 1991–1992 to no more than the amount collected in the tax year 1989–1990 for Baltimore County[ ] and no more than that collected in the tax year 1988–1989 for Anne Arundel County.

*Id.* at 1234. The "cap" provision of the proposed charter amendment for Baltimore County would have precluded property tax revenues from "be[ing] raised by more than 2% per year, beginning with tax year 1992–1993." *Id.* at 1226. Similarly, the "cap"

provision of the proposed charter amendment for Anne Arundel County would "not have allowed property tax revenues to exceed the constant yield rate by a value greater than the increase in the Consumer Price Index from the preceding January, or by 4.5%, whichever would be less[,]" *id.* at 1227, beginning with tax year 1992–1993. The proposed charter amendments in both counties were rejected by the voters at the 1990 general election. *Id.* at 1229.

On appeal, the court concluded that the cap provision of the proposed amendments constituted "proper charter material." *Id.* at 1230. Observing that "a charter is the organic, the fundamental law, establishing basic principles governing relationships between the government and the people[,]" *id.*, the court held that "[t]he proposed [charter] amendments directly involved the relationship between the people and the government by limiting the power of the government to tax." *Id.* (internal quotation marks, citation, and ellipsis omitted) (format altered). Specifically, the court stated:

> Limitations imposed by the people on their government are fundamental elements of a constitution. The Maryland Declaration of Rights and the Bill of Rights to the United States Constitution largely represent limitations on governmental power. In fact, the desire of the people to limit the government's ability to tax was a major cause of the American Revolution. There was no colony of English America, in which the claim of the inhabitants, to exemption from all taxation not sanctioned by their assent, was more familiar than in Maryland. The Constitution of the United States, the Constitution of Maryland, and the charters of [both Maryland counties] are replete with provisions limiting the power of governments to raise and appropriate revenue. Thus, *a limitation on the power of a legislative body to raise revenue is at the heart of the form and structure of our government and thus is proper charter material.*

*Id.* at 1230–31 (internal quotation marks, citations, and footnotes omitted) (emphases added).

The court also relied on a distinction between proposed amendments that "authorize, or preclude, specified types of enactments by legislative bodies," which are ordinarily valid, and those that constitute "complete and specifically detailed legislative scheme[s]," which are ordinarily invalid. *Id.* at 1231 (internal quotation marks and citations omitted); *see Save Our Streets*, 743 A.2d at 756 (recognizing that the *Smallwood* court relied on such a distinction). The court stated that:

> [T]he ... [charter] amendments were not back-door attempts by the voters of [the c]ounties to enact detailed legislation. *Nor did they divest the county councils of the ability to set the property tax rates. Rather, each would have merely precluded a particular type of enactment by the legislative body, namely[,] the power to collect property taxes above the specified cap."*

608 A.2d at 1232 (emphasis added). The court also relied on a treatise for the proposition that "[a] common express restriction upon the municipal power to tax is one limiting the amount or the rate that may be imposed in any one year. The validity of such a provision generally is sustained." *Id.* (quoting E. McQuillin, The Law of Municipal Corporations § 44.26 (3d ed.1984)). Ultimately, the court held that

> the tax cap portions of the [charter] amendments *were facially valid* because *they constituted proper charter material and did not conflict with public general law.* Nevertheless, **we render no opinion as to** *the validity of the tax caps as they might have been applied in practice.* County governments are required by state law to provide many public services such as public education, police and fire protection services, water and sewage services, etc. **If it is subsequently determined in a particular case that a local limitation on property tax revenues** *so hampers a county government that it cannot perform the duties required under state law,* **a tax limitation charter provision** *may well be found to be invalid as applied.*

*Id.* at 1233 (citing E. McQuillin, The Law of Municipal Corporations § 44.26) (emphases added).

With respect to the roll-back provisions, however, the court held that those provisions of the proposed charter amendments violated Maryland Code, Tax–Property Article § 6–302(a) (1986), "which mandates that *the governing body* of each county is to set the property tax rate for the next year."[22] *Id.* at 1234 (emphasis added). The court stated that,

> [u]nlike the tax cap provisions that would have simply placed a limit on the taxing power of each county council, the roll back provisions would have transferred the county councils' [section] 6–302(a) powers to the voters. Instead of the councils setting the tax rates, the roll back provisions would have allowed the voters of Baltimore and Anne Arundel Counties to set the property tax rates for the tax year 1991–1992.

*Id.* Accordingly, the court invalidated the roll-back provisions of the proposed charter amendments. *Id.*

As previously mentioned, the Charter Amendment in the instant case provides:

### AMENDMENT TO THE CHARTER OF THE COUNTY OF KAUA'I

 Shall the Kaua'i County Charter be amended by the addition of a new Article XXXI to read:

ARTICLE XXXI. RESIDENT PROPERTY TAXES. Section 31.01. Resident Property Taxes.

It is the policy of the County that resident taxpayers should be equitably protected when there are significantly rising real estate values and government costs. Therefore, for County residents who have owned and occupied their place of residence beginning in or before the fiscal year 1998–1999, then for the next fiscal year after the adoption of this section real property taxes with respect to such residence shall not exceed the amount of such tax assessed for the 1998–1999 fiscal year. For County residents acquiring their place of residence after the fiscal year 1998–1999 their real property taxes with respect to such residence for the next fiscal year after the adoption of this section shall not exceed the amount of tax assessed for the fiscal year the ownership and residence commences. **For all such taxpayers in no fiscal year after the year in which the tax was restored to the amount in 1998–1999 or the year of acquisition, whichever is applicable, shall the percentage increase in real property tax with respect to such residence exceed the lesser of the percentage rate applicable at the commencement of such fiscal year for cost of living adjustments in retirement benefits by the Social Security Administration, or two percent (2%).** Promptly following its adoption the County shall notify in writing all owners of residential property in its property tax records of the principal terms of this section. The County shall adopt such ordinances, laws, rules and regulations as are necessary to carry out and are consistent with the purpose of the foregoing policy and the terms of this section.

(Capitalization and line breaks in original.) (Internal quotation marks omitted.) (Underscored and bold emphases added.) Similar to the proposed charter amendments discussed in *Smallwood*, the Charter Amendment can be described as consisting of "roll-back" and "cap" provisions. Indeed, the above underscored language can be described as a roll-back provision, and the above bolded language can be described as a cap provision. Guided by the rationale of the court in *Smallwood*, we believe the cap provision of the Charter Amendment in the instant case does not "divest the county council[ ] of the ability to set the property tax rates. Rather, [it] would merely ... preclude[ ] a particular type of enactment by the legislative body, namely[,] the power to collect property taxes above the specified cap."

---

**22.** Specifically, section 6–302(a) provides:
(a) *In general.*—Except as otherwise provided in this section and after complying with § 6–305 of this subtitle, in each year after the date of finality and before the following July 1, *the Mayor and City Council of Baltimore City or the governing body of each county annually shall set the tax rate for the next taxable year on all assessments of property subject to that county's property tax.*
608 A.2d at 1232 n. 15 (emphases added).

*Id.* at 1232. As such, the cap provision of the Charter Amendment operates as "a limitation on the power of a legislative body to raise revenue," *Smallwood,* 608 A.2d at 1231, and is, therefore, "proper charter material." *Id.*

 As previously indicated, the *Smallwood* court invalidated the roll-back provisions inasmuch as it violated Maryland Code, Tax–Property Article § 6–302(a), "which mandates that the governing body of each county is to set the property tax rate for the next year." *Id.* at 1234. Here, the County appears to advance a similar argument that the Charter Amendment "attempts to repeal" certain real property tax ordinances of the Kaua'i County Code and that, therefore, the Charter Amendment is void under the RCCK. However, inasmuch as "[a] basic tenet of municipal corporation law is that an ordinance which conflicts with an express provision in a charter is invalid," *Fasi,* 72 Haw. at 518, 823 P.2d at 744, and there is no dispute that the Charter Amendment was "properly initiated and enacted," *id.* at 519, 823 P.2d at 744, the County's argument is without merit. Consequently, the circuit court erred in concluding that the Charter Amendment is void under the RCCK. The inquiry whether the circuit court erred in entering summary judgment in favor of the County does not end here, however, because the circuit court additionally concluded that the Charter Amendment violated the Hawai'i Constitution.

2. **Whether the Charter Amendment Violated Article VIII, Section 3 of the Hawai'i Constitution**

 The Appellants contend that the circuit court erred in concluding that the Charter Amendment violated the Hawai'i Constitution. Essentially, the Appellants maintain that the circuit court should have followed the "rules of constitutional construction" that mandate the "examination of the unambiguous text" of article VIII, section 3 of the Hawai'i Constitution. (Capitalization omitted.) Specifically, the Appellants argue:

> The circuit court concluded that the Hawai'i Constitution delegates the real property taxation power exclusively to "county councils." Article VIII, however, does not contain the words "county councils," but plainly delegates real property tax power simply to "the counties" as political subdivisions, leaving it up to the respective county charters how that power is exercised[.]
>
> . . . .
>
> Adding language to the [c]onstitution that is not in the text is particularly damaging. Had the framers of [a]rticle VIII intended that "county councils" were being delegated the exclusive authority "relating the [sic] taxation of real property," it would have been a very simple matter for the people to have just said so. The circuit court wrongly relied upon a few references in a committee report to support its conclusion, but sources such as committee reports should not be examined unless there is an ambiguity in the constitutional text.

(Footnote and citations omitted.) The Appellants further assert that "the counties" means "political subdivisions," not "county councils." Specifically, the Appellants claim that:

> The ordinary meaning of the word "county" is "the political unit next below the State in the U.S. . . . the inhabitants of a county." The American College Dictionary 276 (1953). A dictionary roughly contemporary to the 1978 amendment of Haw. Const. art. VIII defines "county" as "the people of a county . . . the largest territorial division for local government within a state of the U.S." Webster's New Collegiate Dictionary 258 (1980).

Moreover, the Appellants assert that, "[e]ven if the circuit court determined that a term in [a]rticle VIII is ambiguous, the court should have examined the term's use in other parts of the [Hawai'i] Constitution before relying upon outside sources," claiming that:

> [S]ections 1 and 2 of [article VIII] . . . ma[ke] clear that the term "the counties" refers to "political subdivisions[,]" not "county councils." [Article VIII, § 1] states:
>
> > The legislature shall create *counties,* and may create *other political subdivisions* within the State, and provide for

the government thereof. Each *political subdivision* shall have and exercise such powers as shall be conferred under general laws.

Haw. Const. art. VIII, § 1 (emphas[e]s added). [Article VIII, § 2] similarly provides:

Each *political subdivision* shall have the power to frame and adopt a charter for its own self-government within such limits and under such procedures as may be provided by general law. . . .

Charter provisions with respect to a *political subdivision's* executive, legislative and administrative structure and organization shall be superior to statutory provisions, subject to the authority of the legislature to enact general laws allocating and reallocating powers and functions.

Haw. Const. art. VIII, § 2 (emphas[e]s added). It is plain that the term "counties" in [a]rticle VIII means just that: the counties are political subdivisions, not "county councils" because county councils do not "frame and adopt a charter," the *county itself* does.

(Emphases in original.) [23]

The County, on the other hand, contends that the Charter Amendment is unconstitutional. Specifically, the County argues that:

[C]ontrary to [the] Appellants' contention that the "ordinary meaning" of "the counties" refers to "the people of the county," . . . the overwhelming weight of authority is that[ ] "[a] county is a political subdivision of the state, created for the purpose of acting for the state in local matters." *Bd. of Educ. of Calhoun County v. Warner*, 853 So.2d 1159, 1169 (Miss. 2003).

The term "county" is generally defined as:

The largest territorial division for *local government* within a state, generally

considered to be a political subdivision and a quasi-corporation. Every county exists as a result of a sovereign act of legislation, either constitutional or statutory, separating it from the rest of the state as an integral part of its territory and establishing it as one of the primary divisions of the state for purposes of civil administration.

Black's Law Dictionary 350 (6th ed.1990) (emphasis added). The term is even defined in the dictionary sources used by [the] Appellants as a "political subdivision." By most definitions, a political subdivision is "[a] division of a state that exists primarily to discharge some function of local government." *Id.*

(Some brackets in original and some added.) (Footnote omitted.) Moreover, the County asserts that, "if the meaning of 'counties' in [article VIII, section 3] is not entirely clear on its face, it is well-settled that extrinsic aids to interpretation may be consulted." (Citation omitted.) The County relies on, *inter alia*, the Committee of the Whole Report No. 7 and Standing Committee Report No. 42 in support of its position that "the real property taxing power [was] delegated exclusively to the county councils."

■■■■ Here, resolution of the disputed issue, that is, whether the Charter Amendment violates article VIII, section 3, requires us to interpret the aforementioned constitutional provision.

The fundamental principle in construing a constitutional provision is to give effect to the intention of the framers and the people adopting it. This intent is to be found in the instrument itself. When the text of a constitutional provision is not ambiguous, the court, in construing it, is not at liberty to search for its meaning beyond the instrument. However, if the text is ambiguous, extrinsic aids may be examined to determine the intent of the framers and

---

23. The Appellants also contend on appeal that the County's claim that the people of the County "had no authority to enact [the Charter Amendment] is barred by laches." (Capitalization altered.) The Appellants, however, raise such contention for the first time on appeal. Generally, "failure to raise or properly reserve issues at the trial level would be deemed waived." *Enoka v. AIG Hawai'i Ins. Co.*, 109 Hawai'i 537, 546, 128 P.3d 850, 859 (2006) (internal quotation marks and citation omitted). Consequently, we conclude that the Appellants' contention pertaining to laches is deemed waived.

the people adopting the proposed amendment.

*State ex rel. Anzai v. City & County of Honolulu*, 99 Hawai'i 508, 519, 57 P.3d 433, 444 (2002) (citing *State v. Kahlbaun*, 64 Haw. 197, 201–02, 638 P.2d 309, 314 (1981)) (format altered). Indeed, we have "acknowledged, in gleaning the intent of the framers and the people, that an examination of the debates, proceedings[,] and committee reports of the Constitutional Convention is useful. Such evidence, however, does not have binding force on this court[,] and its persuasive value depends upon the circumstances of each case." *Pray v. Judicial Selection Comm'n of State*, 75 Haw. 333, 343, 861 P.2d 723, 728 (1993) (internal quotation marks, brackets, and citations omitted). "Moreover, a constitutional provision must be construed in connection with other provisions of the instrument, and also in the light of the circumstances under which it was adopted and the history which preceded it." *Blair v. Harris*, 98 Hawai'i 176, 179, 45 P.3d 798, 801 (2002) (citation omitted) (format altered).

As previously indicated, article VIII, section 3 provides:

The taxing power shall be reserved to the State, except so much thereof as may be delegated by the legislature to the political subdivisions, and *except that all functions, powers and duties relating to the taxation of real property shall be exercised exclusively by the counties,* with the exception of the county of Kalawao. The legislature shall have the power to apportion state revenues among the several political subdivisions.

(Emphases added.) Generally,

[a]rticle VIII of the Hawai'i Constitution (1978)[ ] delineates the legal status and general powers of **"local *government,"* i.e., the counties and other "political subdivisions within the [s]tate."**

24. Article VII, section 1 (1968) provided that:
The legislature shall create counties, and may create other political subdivisions within the State, and provide for the government thereof. Each political subdivision shall have and exercise such powers as shall be conferred under general laws.
Article VII, section 2 (1968) provided in relevant part that:

*Richardson v. City & County of Honolulu*, 76 Hawai'i 46, 65 n. 26, 868 P.2d 1193, 1212 n. 26 (1994) (citing Haw. Const. art. VIII, § 1) (some brackets added and some in original) (emphases added); *see also Marsland v. First Hawaiian Bank*, 70 Haw. 126, 132, 764 P.2d 1228, 1232 (1988) (recognizing that "[a]rticle VIII of the Hawai'i State Constitution defines the relationship between the state and county *governments*" (emphasis added)). We have previously determined that "[t]he plain language of [article VIII, section 3] clearly indicates an intent to confer exclusive authority over real property taxation to the counties." *Anzai*, 99 Hawai'i at 519, 57 P.3d at 444; *see also Gardens at W. Maui Vacation Club v. County of Maui*, 90 Hawai'i 334, 341, 978 P.2d 772, 779 (1999) (stating that Section 3 "was expressly and manifestly designed to transfer to the counties broad powers of real property taxation"). However, we have yet to specifically determine whether the phrase "the counties," as utilized in article VIII, section 3, means "the people of a county," as urged by the Appellants, or "local governments" or "county councils," as urged by the County. The contrary authorities offered by the parties with respect to the ordinary meaning of "the counties" demonstrate the ambiguity created by the utilization of the phrase "the counties" in article VIII, section 3. Consequently, we examine the committee reports and debates of the 1978 Proceedings of the Constitutional Convention of Hawai'i to glean the intent of the framers and the people as to the meaning of "the counties" as utilized in article VIII, section 3.

The Committee on Local Government's standing committee report on then-article VII (1968), entitled "Local Government," covered then-article VII, sections 1, 2, and 3. The Committee "recommend[ed] that [s]ections 1 and 2 of [a]rticle VII be retained in their present form[,]" [24] reporting that:

Each political subdivision shall have power to frame and adopt a charter for its own self-government within such limits and under such procedures as may be prescribed by general law. The prescribed procedures, however, shall not require the approval of a charter by a legislative body.

Your Committee finds that many of the local government issues attempt to define the relationship between county and State and the division of powers between the two. Presently, the State Constitution vests the State legislature with complete authority to determine what powers counties may have and exercise. *The heart of the question raised by proposals to grant counties more authority is whether the grant of powers to* **local government** *through the Constitution best promotes effective service to the people,* which is the common goal of State and local governments.

. . . .

... [T]he Constitution permits **local government** powers by the allocation method, rather than by the shared residual powers method. Under the allocated powers method, *powers are granted by the State to* **local governments.** Under the residual powers method, all powers not granted to the State by Constitution, charter or other law belong to the **local governments.**

Stand. Comm. Rep. No. 42, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978 [hereinafter, 1 Proceedings of 1978] at 593 (1980) (emphases added). The Committee on Local Government proposed to amend article VII, section 3 by adding the following underscored language and deleting the following bracketed language:

Section 3. The taxing power shall be reserved to the State except so much thereof as may be delegated by the legislature to the political subdivisions, [and the] provided, that the power to levy a tax on real property shall be exercised exclusively by the counties. The legislature shall have the power to apportion state revenues among the several political subdivisions.

(Underscored emphasis and brackets in original.) *Id.* at 594. With respect to the proposed amendment to article VII, section 3, the Committee reported:

Presently, under the [HRS], the State is responsible for assessing all real property in the State that is subject to the payment of real property taxes, and for levying and collecting all such taxes, and adjudicating taxpayer appeals. Basic policies defining real property, setting the basis for assessment, determining the manner in which rates are set, setting exemptions and describing the appeal process are the responsibility of state lawmakers. The various **county councils,** on the other hand, establish the specific tax rate to be applied, expressed in terms of dollars per $1,000 of assessed value of property in each county. All revenues derived from the tax, less costs incurred by the State in administering property assessments and collections, are remitted by the State to the counties for their use.

. . . .

Your Committee concludes that the power to levy a tax on real property should be granted to *the counties* for the following reasons:

(1) *County governments are completely responsible and accountable for the administration of their local affairs.* It is felt that *in order to have complete authority over their county finances that real property tax function should be given to the counties.*

(2) By placing total responsibility for the real property tax program with the *counties,* public confusion as to who or which **level of government** is responsible for the real property tax bite would be eliminated.

(3) County administration of the real property tax is consistent with home rule.

(4) There are certain program elements which do not invoke issues of statewide concern and/or which do not lend themselves to single, statewide solutions. In other words, there are different economic bases and needs of the counties which cannot be addressed by statewide real property provisions.

... [E]ach county would be able to [levy a general excise tax of up to 25% of that levied by the State] should *that county*

*council* decide an additional tax source was needed.

*Id.* at 594–95 (emphases added).

During the debates of the Committee of the Whole, Delegate Yvonne Izu proposed to amend article VII, section 3 to read:

The taxing power shall be reserved to the State except so much thereof as may be delegated by the legislature to the political subdivisions; provided that all functions, powers and duties relating to the taxation of real property shall be exercised exclusively by the counties, except the county of Kalawao. The legislature shall have the power to apportion state revenues among the several political subdivisions.

Comm. of the Whole Debates, in 2 Proceedings of the Constitutional Convention of Hawai'i of 1978 [hereinafter, 2 Proceedings of 1978] at 252 (1980) (internal quotation marks omitted). Delegate Izu explained that:

I speak in favor of [my] amendment as I believe it will clarify the intent of the Committee on Local Government. As Standing Committee Report No. 42 states, the intent of the Committee on Local Government is to give all functions, powers and duties relating to the taxation of real property to the counties. However, subsequent to the time of decision-making of the committee and the drafting of the committee proposal, a question was raised as to whether or not the word "levy" is all-inclusive; specifically, the question was raised as to whether it includes the power to exempt property from all or a portion of the tax.

The latest edition of Black's Law Dictionary defines the word "levy" in terms of taxation as: "... the legislative function and declaration of the subject and rate or amount of taxation ..." and so forth. According to Black's, the word "levy" in terms of taxation is defined as its broadest function. This definition appears to concur with what I believe was the committee's intent in the use of the word "levy." However, in view of the fact that this word caused some concern, I propose this amendment to make it clear that all the functions, powers and duties relating to

the taxation of real property shall be exercised by the counties.

This amendment also exempts the county of Kalawao from the power of taxing real property.

*Id.* (internal quotation marks and ellipses in original). Subsequently, the following colloquy ensued among the delegates regarding the exclusion of the county of Kalawao:

DELEGATE [ADELAIDE "FRENCHY"] DE SOTO: ... May I ask why Kalawao was excluded?

. . . .

DELEGATE [ALLEN] BARR: I can answer that question for the delegate. Kalawao is administratively handled by the Department of Health. It does not have any county government of any description of its own. They would like to have some input on some things but they are not, it appears, going to get that. However, they certainly are not—the people in Kalawao—not at this time prepared to take over full functioning of a county government, including the property tax. If we were going to do that to the people in Kalawao, we would probably have no choice but to make them a part of the County of Maui. Now, I'm not sure we're unwilling to do that, but that's not the issue at this point. *The point is that Kalawao at this time has* ***no county government that can inherit these functions of property tax*** . . . .

. . . .

... I would like to emphasize how extremely important the counties—*the county governments, the county officials and those who are close to county governments*—feel that this particular issue is. *This amendment will give us the language that will give us a power we feel is very, very important.* ...

. . . .

DELEGATE DE SOTO: Mr. Chairman, I have another question. If you would allow me to direct my question to Delegate Barr, I would like to know why we have to give [a] constitutional basis to clearly outline or exempt Kalawao when, because of their circumstances, they are already exempt. Being by nature a suspicious person, I am looking at whether or not there

will be any patients there in ten years and the area would then, under this clause, be exempt from any kind of levy of taxes.

. . . .

DELEGATE BARR: . . . Kalawao is an unusual situation as you are aware. We don't make a great number of distinctions in Hawai'i government among the levels of municipality. We just have the one category—county. *We call Kalawao a county although it has* **no direct governmental relationship** *in the way it operates with any of the other counties.* So in order for the law to apply just to those counties which in fact operate as municipalities, we must say "except the county of Kalawao." It's because the same word is used—county—but the reality of the area is different.

*Id.* at 252–53 (emphases added). Delegate Helene Hale then made the following remarks in speaking in favor of Delegate Izu's amendment:

> . . . *I do ask your support to make the complete responsibility for real property tax*—the revenues of which go exclusively to the counties—*the responsibility of the* **county government.** In the interest of responsible *government, the taxation power and the taxes that are derived from this power should rest squarely with the* **local government units.** If there's any further rise in real property assessed values and in taxation, the people will know where to go to put their concerns. . . .

*Id.* at 254 (emphases added). After some discussion by the delegates, Delegate Michael Crozier stated:

> Mr. Chairman, I have a question. *I see we're giving the* **local governments** *the right to set their own tax.* Now, what if they become derelict and didn't collect enough taxes? . . . If the county governments became lax, would the State have to come in and supply the necessary money to take care of the projects that the counties couldn't handle?

*Id.* at 255 (emphases added). Chairman Floyd Pulham responded: "I'm sure you could be correct in certain instances. However, I don't see this as a valid happening unless you have no faith in your *county government* at all." *Id.* (emphasis added).

Subsequently, the delegates voted to approve Delegate Izu's amendment. *Id.*

After approving Delegate Izu's amendment, the delegates debated on Delegate James Shon's proposal to "delet[e] all amendments to the current constitutional language in [s]ection 3 of [a]rticle VII and returning it to as it was[, *i.e.,* Haw. Const. article VII, section 3 (1968) ]." *Id.* at 258. In speaking against Delegate Shon's proposed amendment, Delegate Riki Hokama stated:

> I speak in favor of transferring the entire real property tax program to the counties. In addition to being consistent with trends toward greater local self-government, the transfer proposal is an idea whose time has come. The *county governments* have told us that they are willing to take on the responsibility and they have presented solid arguments reinforcing their request. . . .
>
> [In addressing a] concern over the loss of exemptions[,] . . . we have not heard any talk of a county drastically amending the present types of exemptions. Practically speaking, the pressure would be on extending or raising exemptions. This does not mean that the **county councils** will not adjust exemptions in the context of other measures of tax relief such as a circuit breaker approach, for example. *I should think we would want the* **county councils** *to take a fresh look at the real property tax.* We have got to realize that the real property tax is the single most important local tax of the counties. Since exemptions affect the real property tax base and have a direct impact on local revenues, each county should have the authority to judge which exemptions are appropriate in the context of its own financial condition. *The* **county councils,** *not the legislature, are better able to assess local conditions and determine whether an exemption would serve a worthwhile purpose within that affected county.*
>
> . . . *The legislature presently has responsibility for granting exemptions, and under this proposal the* **county councils** *would be the ones responsible.* If either legislative body were to remove an exemption which could be translated into higher

operating costs and higher utility bills for the taxpayer, you may be assured that the people would be well aware of when and where that action originated.

*Id.* at 260 (emphases added). In speaking in favor of Delegate Shon's proposed amendment, Delegate Yoshio Kojima stated: "I simply have more confidence in the state government in levying taxes than in the *county governments*." *Id.* at 265 (emphasis added). In speaking against Delegate Shon's proposed amendment, Delegate Leon Sterling stated:

In our county, the County of Hawai'i, it is the *county council* that has to face the daily problems. It is the *county council* that gets all the phone calls and complaints. It is the *county council* that has to appear before the public in public hearings and other hearings that are held to explain certain positions, or why they can't get certain things, or why other things have to be placed on priorities. He, *the councilman*, is in daily contact—he or she—with his constituents. He can't say, I can't answer that until the next legislature. He's the one who must make the decisions every day. *I think this is what we mean when we speak of home rule.*

Again, like everyone else, we have our checks and balances. He has to run for office—he or she has to run for office again. *He's committed to do the best he can for his people.* But I think we're losing sight of the implementation of any program, that it is the elected person who must answer. . . .

*Id.* (emphases added). The delegates ultimately voted to reject Delegate Shon's proposed amendment. *Id.* at 268.

Subsequent to the debate, the Committee of the Whole recommended to amend article VII, section 3 by adding the following underscored language and deleting the following bracketed language that was earlier recommended by the Committee on Local Government:

The taxing power shall be reserved to the State except so much thereof as may be delegated by the legislature to the political subdivisions [provided, that the power to levy a tax on]; except that all functions, powers and duties relating to the taxation of real property shall be exercised exclusively by the counties, [except] with the exception of the county of Kalawao. The legislature shall have the power to apportion state revenues among the several political subdivisions.

Comm. of the Whole Report No. 7, in 1 Proceedings of 1978 at 1008 (internal quotation marks omitted) (underscored emphases and brackets in original). The Committee of the Whole reported:

Your Committee changed this amendment to include the phrase "all functions, powers and duties relating to the taxation of real property" in order to clarify the standing committee's intent to grant all taxing powers relating to real property to the counties, except Kalawao. There was some question under the earlier language as to whether or not the counties would have the power to set exemptions. Although the mover of the amendment[, *i.e.*, Delegate Izu,] explained that the "power to levy" did include the lesser power of setting exemptions, this amendment was adopted as having the better language.

*Your Committee of the Whole exempted Kalawao because the members felt that at this point Kalawao had no county government that could inherit these powers but that possibly in the future there would be a governmental organization for Kalawao, at which point it could assume its proper role. It is merely labelled [sic] a county today although in reality it does not rise to the level of a county.*

Your Committee of the Whole defeated several other amendments to this section of taxation and finance. . . . Your Committee rejected an amendment to return this section to its original language which rests all taxing powers with the State[, *i.e.*, Delegate Shon's proposed amendment]. Some members argued that this section should not be capriciously tampered with in light of the social policies already set forth by the State through its enactment of exemptions. *Other members pointed out that* the trend is toward more home rule and that *the **county governments** want to take on more responsibility. That **branch of gov-***

48

*ernment that is responsible for running certain affairs should have the responsibility and right to collect revenues. It is anticipated that* **county councils,** *with their daily contact with constituents, will be more responsive. . . .*

*Id.* at 1008–09 (emphases added). As previously indicated, article VII, section 3 "was renumbered [to article VIII, section 3] and amended to include [the] provision vesting exclusive taxation authority over real property in the counties[ ]" following the 1978 Constitutional Convention. *Anzai,* 99 Hawaiʻi at 510, 57 P.3d at 435.

 Based on our reading of article VIII, section 3, the debates of the 1978 Constitutional Convention pertaining to article VIII, section 3, and the Standing Committee's and Committee of the Whole's reports, we conclude that "the counties," as referred to in article VIII, section 3, clearly means county or local *governments, i.e.,* county councils. Such a conclusion comports with our prior decisions that have generally recognized that article VIII of the Hawaiʻi Constitution delineates the general powers of "local *government,*" *i.e.,* the counties and other political subdivisions within the state. *Richardson,* 76 Hawaiʻi at 65 n. 26, 868 P.2d at 1212 n. 26; *see also Marsland,* 70 Haw. at 132, 764 P.2d at 1232.

Anticipating that we might so conclude, the Appellants finally argue that, even if the phrase "the counties" means "county councils," the enactment history of article VIII, section 3 does not indicate that the " 'broad' delegation of the power to the county councils was intended to *preclude* the people of the counties also exercising the power." (Emphasis added.) Moreover, the Appellants also appear to argue that, because the real property taxation power was delegated to the "county governments" and the people of Kauaʻi are the "county government," the Charter Amendment is constitutional.

 The Appellants, however, do not point to anything in the debates of the 1978 Constitutional Convention pertaining to article VIII, section 3 and the Standing Committee's and Committee of the Whole's reports that support their position that "the people of the counties" somehow share the functions,

powers, and duties relating to real property taxation with the county or local governments, *i.e.,* the county councils. Additionally, inasmuch as the delegates expressly recognized that the county of Kalawao has "no county government that can inherit [the] functions of property tax" and that it has "no direct governmental relationship in the way it operates with any of the other counties," it clearly follows that the delegates did *not* intend that the phrase "county governments" equates to "the people of the counties." Thus, because the Charter Amendment usurps the county government's/county council's "functions, powers and duties relating to the taxation of real property," we hold that the Charter Amendment is unconstitutional pursuant to article VIII, section 3 of the Hawaiʻi Constitution. Accordingly, we hold that the circuit court not err in granting summary judgment in favor of the County on the basis that the Charter Amendment violated article VIII, section 3 of the Hawaiʻi Constitution.

## IV. CONCLUSION

Based on the foregoing, we reverse that portion of the circuit court's May 20, 2005 final judgment wherein the circuit court ruled that the Charter Amendment violated the RCCK. In all other respects, we affirm.

ACOBA, J., dissenting, with whom DUFFY, J., joins.

Dissenting Opinion by ACOBA, J., with whom DUFFY, J., joins.

With all due respect, our role is to protect the judicial process, not to subvert it. In *sua sponte* deleting Defendant–Appellee Kauaʻi County Council (County Council) as a defendant in this case and adding it back as the putative plaintiff in order to create a supposed controversy between the County Council and Defendant–Appellee Mayor of Kauaʻi (Mayor) and Defendant–Appellee Finance Director of Kauaʻi (Finance Director), the majority does exactly that, manipulating the lawsuit so as to create a controversy that did not in fact exist when the suit was filed, when it was decided by the Circuit Court of the Fifth Circuit (the court), when it was appeal-

ed to this court, and when it was argued by the parties before us.

In accomplishing the alteration of this lawsuit, the majority misconstrues the amended complaint, in effect substituting the County Council in place of Plaintiff–Appellee County of Kaua'i (County) as the plaintiff, and misapplies the rules of court, in this case Hawai'i Rules of Civil Procedure (HRCP) Rule 21, in order to drop the County Council as a named defendant. HRCP Rule 21 was never intended to authorize a realignment of the parties in order to birth a controversy, but is applied in the cases when an underlying controversy exists in the first place. But most tellingly, there cannot be a controversy between two sides of a lawsuit where, as in this case, "both [sides] desire precisely the same result." *Moore v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 47, 48, 91 S.Ct. 1292, 28 L.Ed.2d 590 (1971) (per curiam).

Under these circumstances, there are no manageable limits to the approach employed by the majority—moving a party from one position to another position in the same lawsuit allows this court to decide what case will be deemed justiciable at its own behest. If it can do that in this case, then the majority can do the same in any case. The only way the merits in this case are reached by the majority is through the manipulation of the parties and the lawsuit—a course that, in my view, fosters unwise and dangerous precedent.

## I.

In this appeal, Intervenors–Appellants Gordon G. Smith, individually; Walter S. Lewis, in his capacity as trustee of the Walter S. Lewis Revocable Living Trust; Monroe F. Richman, Trustee, Richman Family Trust; and Ming Fang, Trustee, Ming Fang Trust (Appellants) appealed from the May 20, 2005 final judgment of the court denying the Appellants' motion to dismiss and granting the motion for summary judgment filed by the County. In granting summary judgment the court determined that Charter Amendment XXXI (Charter Amendment or Article XXXI) violated article VIII, section 3 of the Hawai'i State Constitution and the Kaua'i County Charter.

On appeal Appellants specifically ask that the "[court] ... be reversed, and the [suit] be dismissed for lack of jurisdiction." As to the largely undisputed facts of the case, Appellants' Opening Brief states as follows:

> The authority to tax real property has been delegated to the counties by the Hawai'i Constitution.... *Article XXXI [of the Kaua'i County Charter] restores property taxes to 1998 levels for owner-occupied homes of residents who have owned their properties from 1998 or before. For homeowners who purchased after 1998, taxes are based on the value at which their property was assessed when purchased. Future tax increases for all resident homeowners cannot exceed 2% per year.*
> ...
>
> ....
>
> *... Article XXXI was approved by an overwhelming margin [of the electorate].*
> ...

(Emphases added.) The opening brief also states:

> *During the run-up to Article XXXI's enactment, every Kaua'i official came out publicly against the measure, [including] the Mayor and the County Council ....* Seven council members purchased a newspaper ad encouraging citizens to "Vote 'NO' on the Real Property Tax Charter Amendment." The County Attorney filed a "petition" seeking "the [c]ourt's clarification on legal issues surrounding the proposed Charter amendment," because "the people of Kaua'i need to know whether this amendment is legal and valid."

(Emphasis added.) As alleged in the amended complaint, subsequently,

> *[t]he Kaua'i County[, represented by the County Attorney,] sued the Mayor, the County Finance Director, and the Kaua'i County Council. The County Attorney sought a declaration that Article XXXI was ultra vires as beyond the power of the people of the County, and an injunction preventing the Officials from implementing it. ...* The County Attorney claimed Article XXXI was ultra vires because the county council has a monopoly on exercise of property tax authority delegated by the

**50**

Hawai'i Constitution, and the County itself has no such authority. The County Attorney also asserted it was a "disguised" initiative or referendum ordinance....

(Emphasis added.) Thereafter,

[f]our local homeowners intervened in the ... lawsuit asking the court to dismiss the ... case. When the [court] denied their motion to dismiss, the homeowners [remained] in the [lawsuit]....

On the County Attorney's motion for summary judgment, the [court] invalidated Article XXXI, holding that the Hawai'i Constitution delegated real property tax authority exclusively to the county councils, and that Article XXXI ... was, in fact, a disguised ordinance by initiative or referendum.

(Emphasis added.)

## II.

The amended complaint was brought by the County by its County Attorney, as plaintiff, against the Mayor, the Finance Director, and the County Council, as defendants [collectively, Defendants–Appellees]. The County sets forth the following material allegations in its amended complaint:

1. This is an action to have this [c]ourt declare the Charter Amendment voted upon by the Kaua'i electorate in the general election on November 2, 2004 is invalid ("Charter Amendment") and to enjoin [D]efendants[-Appellees] from taking any action which would give effect to said Charter Amendment.

. . . .

16. The Kaua'i County Charter Article XXII governs the Initiative and Referendum process. Section 22.02 of Article XXII sets forth the limits on the powers of initiative and referendum and expressly prohibits initiatives that affect "any ordinance authorizing or repealing the levy of taxes."

. . . .

20. The intent of Article VII, section 3 of the Hawai'i State Constitution is specifically to delegate the real property tax function to the county councils because the county councils are in a better position to administer local affairs.

. . . .

22. [Hawai'i Revised Statute (HRS)] § 50–15 provides that there is expressly reserved to the State Legislature the power to enact all laws of general application through the State on matters relating to the fiscal powers of the counties (except as delegated to the counties), and neither a charter or ordinance adopted under a charter shall be in conflict therewith.

. . . .

25. An actual controversy has arisen and presently exists between the County and [D]efendants[-Appellees] Mayor, Finance Director and Council. The interest in controversy are direct and substantial. The County is entitled to a declaratory judgment that the Charter Amendment is invalid as well as an order enjoining [D]efendants[-Appellees] from giving effect to the invalid Charter Amendment, as well as such other relief which may be a result of the entry of such declaratory judgment.

26. An actual controversy exists between the Charter Amendment and the Kaua'i County Charter and the Kaua'i County Code because the Charter Amendment language is in direct conflict with the Kaua'i County Charter and the Kaua'i County Code.

(Emphases omitted and emphases added.)

Defendants–Appellees answered the County's first amended complaint by stating in pertinent part that "[t]he [D]efendants[-Appellees] admit the allegations contained in paragraphs 1 through 16, 20, 22, 25 and 26 of the Complaint." (Emphasis added.) Hence the supposed opposing parties agree that (1) "[t]he intent of Article VII, section 3 of the Hawai'i State Constitution is specifically to delegate the real property tax function to the county councils because the county councils are in a better position to administer local affairs"; (2) the court should "declare that the Charter Amendment voted upon by the Kaua'i electorate in the general election on November 2, 2004 is invalid ... [and] enjoin [D]efendants[-Appellees] from taking any action which would give effect to said Charter Amendment"; (3) "the Charter Amendment

language is in direct conflict with the Kaua'i County Charter and the Kaua'i County Code"; and (4) "[t]he County is entitled to a declaratory judgment that the Charter Amendment is invalid as well as an order enjoining [D]efendants[-Appelles] from giving effect to the invalid Charter Amendment, as well as such other relief which may be a result of the entry of such declaratory judgment." *See supra.*

## III.

Not surprisingly, then, Appellants contend, *inter alia*, that this case is not justiciable because (1) "there is no 'actual controversy' and the County Attorney, the Mayor, the Finance Director, and the County Council are not 'adversaries' or 'contending parties' with 'antagonistic claims'"; and (2) "intervention [by the Appellants] to contest justiciability [in the instant case] does not create justiciability." (Some capitalization omitted.)

In this regard, the County correctly points out that Hawai'i state courts are not subject to the "case or controversy" requirement as are the federal courts. *See Trs. of Office of Hawaiian Affairs v. Yamasaki*, 69 Haw. 154, 170, 737 P.2d 446, 455–56 (1987) (stating that "[u]nlike the federal judiciary, 'the courts of Hawaii are not subject to a cases or controversies limitation like that imposed by Article III, [section] 2 of the United States Constitution'" (quoting *Life of the Land v. Land Use Comm'n*, 63 Haw. 166, 171, 623 P.2d 431, 438 (1981)) (internal quotation marks, ellipses, and other citation omitted)).

However, the County incorrectly assumes that Appellants' contention relies on the "case or controversy" requirement. While state courts are not subject to such a requirement, generally, it is the duty of this court to decide actual controversies. *Tauese v. State, Dep't of Labor & Indus. Relations*, 113 Hawai'i 1, 16 n. 8, 147 P.3d 785, 800 n. 8 (2006). (stating that "[t]he duty of this court, as of every other judicial tribunal, is to decide *actual controversies* by a judgment which can be carried into effect, and not to

give opinions upon moot questions or abstract propositions" (quoting *Wong v. Bd. of Regents, Univ. of Hawaii*, 62 Haw. 391, 394–95, 616 P.2d 201, 204 (1980) (emphasis added)))).[1] Thus, this court has stated:

> Though the courts of Hawaii are not subject to a "cases or controversies" limitation like that imposed upon the federal judiciary by Article III, [section] 2 of the United States Constitution, *we nevertheless believe judicial power to resolve public disputes in a system of government where there is a separation of powers should be limited to those questions capable of judicial resolution and presented in an adversary context.*

*Life of the Land*, 63 Haw. at 171–72, 623 P.2d at 438 (citing *Reliable Collection Agency, Ltd. v. Cole*, 59 Haw. 503, 510, 584 P.2d 107, 111 (1978)).

Relatedly, as to the County's request for declaratory judgment,[2] the declaratory judgment statute, HRS § 632–1 (1993) requires the presence of antagonistic interests and provides in pertinent part:

> Relief by declaratory judgment may be granted *in civil cases where an actual controversy exists between contending parties, or where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary party who also has or asserts a concrete interest therein,* and the court is satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding.

(Emphasis added.) Under the foregoing authority, the granting of declaratory relief in civil cases is proper only in instances where parties are adversarial, and further, in instances "where an actual controversy be-

---

1. The parties do not assert any exceptions to this rule in this case.

2. The request for injunctive relief would only be in aid of a declaratory judgment decision favorable to the County.

tween contending parties" or "antagonistic claims are present between the parties involved." *Id.; see Life of the Land,* 63 Haw. at 178, 623 P.2d at 442. Hence, while state courts are not bound to the federal case and controversy requirement, an actual controversy must exist for declaratory relief to be granted in both state and federal court.[3]

Analogously, in *Moore,* the United States Supreme Court dismissed the case for lack of an actual controversy. 402 U.S. at 47, 91 S.Ct. 1292. In that case, the appellants sought review of the district court's ruling declaring a portion of the North Carolina anti-busing statute unconstitutional, and to enjoin its enforcement. *Id.* "At the hearing both parties argued to the three-judge court that the anti-busing law was constitutional[.]" *Id.* The Court stated, "We are . . . confronted with the anomaly that *both litigants desire precisely the same result, namely a holding that the anti-busing statute is constitutional. There is, therefore, no case or controversy* within the meaning of Art[icle] III of the Constitution." *Id.* at 47–48 (emphasis added) (citation omitted); *see Teamsters Local 513,* 325 F.Supp. at 991 (denying declaratory relief for lack of controversy where "it [was] apparent that *the interests of both parties to [the] alleged controversy [would] be served by a determination that the state conviction is not for violation of 'narcotics laws', and it is equally apparent that the interests of neither will be served by a determination that it is* " (emphasis added)).

## IV.

In light of the agreement among all the parties to the amended complaint that the Charter Amendment is invalid, there is a lack of controversy or of antagonistic claims among the parties to the case brought. It is manifest that there is no actual controversy among the parties to the amended complaint because they *all* agree that the subject Charter Amendment is "invalid," *i.e.,* both the County and Defendants–Appellees "desire precisely the same result." *Moore,* 402 U.S. at 47–48, 91 S.Ct. 1292. When opposing parties share identical interests, there is no actual controversy and the court is left with nothing to decide. *Auberry Union Sch. Dist. v. Rafferty,* 226 Cal.App.2d 599, 603, 38 Cal. Rptr. 223 (Cal.Ct.App.1964) ("Where it is apparent that the defendant does not actually oppose the position taken by the plaintiff, there obviously can be no controversy and there is nothing to be determined by the court." (Citation omitted.)); *Maxwell v. Brougher,* 99 Cal.App.2d 824, 828, 222 P.2d 910 (Cal.Ct.App.1950) ("Obviously there cannot be a controversy unless one party *actually* opposes the position taken by the other. If there be no controversy there is nothing to be determined by the court." (Emphasis added.)).

Based on the foregoing, Appellants correctly assert that the instant case lacks an actual controversy and should be dismissed. For "it is apparent that the interests of both [the County and the Defendants–Appellees in this case] . . . [would] be served by a determination that . . . [the Charter Amendment is invalid], and it is equally apparent that the interests of neither will be served by a determination that it is [valid]." *Teamsters Local 513,* 325 F.Supp. at 991. In that regard, "[i]t is the prevailing doctrine in our judicial system that an action not founded upon an actual controversy between the parties to it, and brought for the purpose of securing a determination of a point of law, is collusive and will not be entertained." *State v. Hoang,* 93 Hawai'i 333, 336, 3 P.3d 499, 502 (2000) (citing *Reynolds v. Van Culin,* 36

---

3. The Federal Declaratory Judgment Act provides that declaratory relief may be granted "in a case of actual controversy . . . ."

 The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that in a case of actual controversy a federal court may declare the rights and other legal relations of any interested party * * * whether or not further relief is or could be sought. A controversy, as contemplated by Article III of the Constitution and the Declaratory Judgment Act, is one that is appropriate for judicial determination, i.e., one which is not of a hypothetical or abstract character, and which admits of specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

 *Teamsters Local 513 v. Wojcik,* 325 F.Supp. 989, 991 (E.D.Pa.1971) (citing 28 U.S.C.A. § 2201) (internal quotation marks and other citation omitted).

Haw. 556 (1943)) (internal quotation marks, ellipses, and brackets omitted); *see Kilpatrick v. Kilpatrick,* 205 S.W.3d 690, 700 (Tex. App.2006) ("It is axiomatic that a court must have subject matter jurisdiction in order to adjudicate a dispute, and without it, the merits of a case may not be reached." (Citations omitted.)).

## V.

As to Appellants' assertion that the instant case lacks an actual controversy, the County further maintains that participation by Appellants cured concerns regarding the lack of adversity. Appellants however contend that to treat their participation as curative of jurisdictional defects would "encourage filing collusive lawsuits in order to 'smoke out' defendants, with no assurance that those who might come forward would have sufficient motivation or resources to provide a genuine adversary for the collusive parties." In fairness, because the intervention in this lawsuit by Appellants was only for the purpose of contesting jurisdictional defects, their presence as Intervenors should not supply the necessary adverse requirement. In *Santa Monica v. Stewart,* 126 Cal.App.4th 43, 24 Cal.Rptr.3d 72 (2005), the California Supreme Court explained that intervention does not "obviate[ ] concerns about the justiciability" where the intervenor seeks "to intervene solely to dismiss the action as a nonjusticiable controversy." *Id.* at 87, 87 n. 8 (stating that here the intervenor "sought to intervene for the sole purpose of dismissing the action on the ground the court lacked subject matter jurisdiction").

## VI.

The majority acknowledges that "a plaintiff must be adversarial to a defendant to create an actual case or controversy sufficient for a court to invoke jurisdiction." Majority opinion at 30, 165 P.3d at 931 (citing *State v. Fields,* 67 Haw. 268, 274, 686 P.2d 1379, 1385 (1984)). Thus, in order to create the missing controversy, the majority first

asserts that although "the instant declaratory action was not brought in the name of the County Council ... [but] was brought by 'the County' ... [,] it is clear from a plain reading of the allegation in the first amended complaint that the [County] has brought the instant case on behalf of the County Council." Majority opinion at 28, 165 P.3d at 929 (footnote and citation omitted). In essence, the majority unilaterally "substitutes" the County Council in place of the County.[4]

Further, in doing this, the majority recognizes that it is "[p]roblematic ... that the County Council is *specifically* named as a defendant in this case[, and] consequently, ... the County is, in essence, suing itself." Majority opinion at 29, 165 P.3d at 930 (emphasis and footnote omitted) (emphasis added). In order to cure this problem, the majority "dismiss[es] the County Council as a dispensable defendant in this case[,]" relying on HRCP Rule 21 relating to misjoinder of parties in a lawsuit. Majority opinion at 35, 165 P.3d at 936 (footnote omitted). Repositioning the parties thusly, the majority concludes that "by dropping the County Council as a defendant an actual controversy exists[,]" majority opinion at 35, 165 P.3d at 936, and reaches the merits of the case. With all due respect, the majority's approach is wrong.

## VII.

First, the majority, in assuming that the parties "brought the instant case on behalf of the County Council[,]" seemingly finds that the fact that the case was brought in the name of the County and not under the County Council is of no consequence and can be completely disregarded. Majority opinion at 28–29, 165 P.3d at 929–30 (citing *State ex rel. Bronster v. Yoshina,* 84 Hawai'i 179, 185, 932 P.2d 316, 322 (1997) (stating that "for the purposes of this appeal, the fact that the attorney general brought this action in the name of the state rather than in the name of the governor represents a distinction without

---

4. Although the majority claims this is a mischaracterization, majority opinion at 35, 165 P.3d at 936, in holding that the County, which had sued the County Council, represents the County Council, the majority has effectively replaced the County with the County Council. *See* discussion *infra.*

**54**

difference")).[5] This is contrary in principle to the express language in the pleadings.

### A.

The amended complaint, as set forth by the County Council itself and as acknowledged by Defendants–Appellees, treats the County and the County Council as separate entities between whom there is a dispute. The amended complaint alleges that "[a]n actual controversy has arisen and presently exists *between* the County and defendant[ ] ... [County] Council." (Emphasis added.) Hence, under the amended complaint, the County alleges that the County Council, which it is suing, is an entity separate from the County, not an entity for which it is acting.

Nevertheless, the majority in effect substitutes the County Council for the County, although the County Council is but a constituent part of the County government. *See* majority opinion at 35, 165 P.3d at 936 (stating that the "[County], by asserting that the Charter Amendment usurps the taxing authority of the County Council, has asserted an injury *on behalf of the Council*" (emphasis added)). Based on the allegations made in paragraphs 19, 20, and 28 of the amended complaint, the majority contends that the County Council is the real party in interest. *See* majority opinion at 27–28, 165 P.3d at 928–29 (stating that "[w]e believe the first amended complaint alleges a sufficient injury ... to confer standing ... upon the County Council" (citing paragraphs 19, 20, and 28 of the first amended complaint)) (emphasis omitted).

With all due respect, it is incorrect to argue, as the majority does, that "it is clear ... that the [County] has brought the instant case on *behalf of the County Council* [,]"

majority opinion at 28, 165 P.3d at 929 (emphasis added), inasmuch as the County sued the County Council as a defendant, and the County and Defendants–Appellees distinguish between the County as an entity in and of itself, as opposed to the Mayor, Finance Director and the County Council. Plainly, then, the County was not acting on behalf of the County Council it was suing, as the majority contends. Moreover, if as the majority contends, the injury is suffered by the County Council and not the rest of the County government or the political subdivision designated as the County of Kaua'i, the appropriate plaintiff is the County Council itself as the real party in interest, not the County. But there is no legal basis for substituting the County Council for the County.

### B.

HRCP Rule 21,[6] referred to by the majority, does not provide a vehicle for impliedly substituting the County Council for the County. In circumstances similar to this case, it has been held that "*Rule 21 cannot be employed as a means to create a case or controversy through substitution where one no longer exists. Fox v. Bd. of Trs. of the State Univ. of New York,* 148 F.R.D. 474, 486 (N.D.N.Y.1993) [hereinafter *Fox II*] (emphasis added). In *Fox II,* the district court observed "the present action had been rendered moot because in the intervening years the plaintiff students had graduated." *Id.* at 476 (citing *Fox v. Bd. of Trs. of the State Univ. of New York,* 764 F.Supp. 747, 757 (N.D.N.Y.1991) [hereinafter *Fox I*] ). The district court explained that when a case becomes moot "the Constitution's case or controversy requirement ... is not satisfied and a federal court lacks subject matter jurisdiction over the action." *Id.*

---

5. *Bronster* is clearly inapposite. In that case the Governor was not a named defendant and there was a true underlying controversy. The parties were adversaries in that the plaintiff (State of Hawai'i) sought declaratory judgment against the defendants (the chief election officer and the clerks of the Senate and the House) who had processed Hawai'i Constitutional amendments for the voters without proper notice to the Governor. *Bronster,* 84 Hawai'i at 180, 932 P.2d at 317. On the other hand, the defendants contend-

ed that the notice requirements had been met. *Id.* Here, the majority not only incorrectly assumes that the County intended to bring the instant case on behalf of the County Council, but proposes that despite the fact that the County Council was expressly named as a defendant in the instant case, it can simply be "dropped" as a defendant.

6. *See infra* for text of HRCP Rule 21.

*Fox II* noted that "although not relied on by the court in [*Fox I*], the plaintiffs submit[ted] that Rule 21 could provide a basis for allowing amendment of the complaint" to substitute new parties. *Id.* at 484. According to *Fox II*, "[s]everal courts have recognized *the impropriety of relying upon Rule 21 to substitute parties, as opposed to adding or dropping parties*." *Id.* (emphasis added) (citing *Sable Commc'ns of California v. Pacific Tel. & Tel. Co.*, 890 F.2d 184, 191 n. 13 (9th Cir.1989) (denying a motion by the plaintiff to substitute members of the California Public Utilities Commission, which might have allowed the action to survive, because "[n]othing on the face of Rule 21 allows substitution of parties" and "[t]he rule by its terms creates means to cure 'misjoinder of parties' ")).

Similar to the majority's action here with respect to the County, the plaintiffs in *Fox II* attempted "to substitute" a claimant. *Id.* The district court concluded that such a substitution is "simply not within the scope of Rule 21, which is not a rule providing for the substitution of parties," but which "was enacted to minimize the harsh effects of common-law adherence to technical rules of joinder" and not "in order to deal with problems of defective federal jurisdiction." *Id.* (internal quotation marks and citations omitted); *see also Schwartz v. Metro. Life Ins. Co.*, 2 F.R.D. 167, 168 (D.Mass.1941) (Rule 21 "contemplates the retention of a party or parties after the other party or parties are dropped or before they are added" and as such the guardian suing a representative of an insane ward could not institute a personal action against a defendant by substitution).

*Fox II* reasoned that "[i]f that were a proper application of Rule 21, then parties could routinely invoke Rule 21 as a means of circumventing a finding of mootness, thus rendering the mootness doctrine a legal fiction." *Fox II*, 148 F.R.D. at 486. By the same token, the same problem arises here for the majority, which in effect circumvents the lack of a controversy by seemingly "invok[ing] Rule 21" to allow substitution of a party.

*Fox II* noted that it did not "ignore the fact that case support does exist ... for permitting substitution of parties under Rule 21." *Id.* In this regard, the majority seemingly relies on *Mullaney v. Anderson*, 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458 (1952). In that case, the Court allowed the real party in interest to be substituted for his agent. The Alaska legislature had imposed a $5 fee on resident fisherman and a $50 fee on nonresident fishermen. *Id.* at 416, 72 S.Ct. 428. The Alaska Fisherman's Union and its Treasury–Secretary brought suit on behalf of 3,200 nonresident union members. *Id.*

*Mullaney* explained that "[t]he *original plaintiffs alleged without contradiction that they were authorized by the nonresident union members to bring this action in their behalf.* This claim of authority is now confirmed in the petition supporting the motion to add the member-fishermen as plaintiffs." *Id.* at 417, 72 S.Ct. 428 (emphasis added). As such, *Mullaney* said that "[t]o grant the motion merely puts the principal, the real party in interest, in the position of his avowed agent" and "[t]he addition of these two parties [as] plaintiff[s] can in no wise embarrass the defendant. *Nor would their earlier joinder have in any way affected the course of the litigation.*" *Id.* (emphasis added).

The instant case is manifestly distinguishable. Here the County did not "allege[ ] ... [that it was] authorized by the [City Council] to bring this action on their behalf" as was the case in *Mullaney*. *Id.* Rather, despite the majority's allegations, the County expressly brought suit against and not "on behalf of the County Council." Majority opinion at 35, 165 P.3d at 936. Additionally, in this case, as contrasted with *Mullaney*, an "earlier joinder" would have definitely "affected the course of the litigation[,]" 342 U.S. at 417, 72 S.Ct. 428, inasmuch as the subsequent substitution and dismissal of the County Council performed by the majority would have been unnecessary. Thus, substitution of the County Council for the County is not authorized under HRCP Rule 21.

### C.

Substitution of a party is allowed, but under HRCP Rule 25 [7] entitled "Substitution of

# 56

Parties." Under the express provisions of that rule, substitution is only appropriate in particularized situations. As noted in *Fox II*, Rule 25 "[b]asically ... designates four specific categories where substitution is appropriate: (1) death; (2) incompetency; (3) transfer of interest; and (4) public officers-death or separation from office." 148 F.R.D. at 486 n. 29 (citing FRCP Rule 25).[8] Obviously, none of the categories pertain here. Thus, substitution of the County Council for the County is not authorized under HRCP Rule 25.

## VIII.

Second, as noted before, the majority recognized that following its implied substitution of the County Council for the County as plaintiffs, "the presence of the County Council as a defendant in this case destroys the existence of an actual controversy" because the County Council would be suing itself. Majority opinion at 32, 165 P.3d at 933. Notwithstanding the majority's acknowledgment of the resulting lack of controversy, it de-

cides again *sua sponte* "at this stage of the proceeding, ... to 'drop,' *i.e.*, dismiss, the County Council [as a defendant in the instant case,] to cure the 'spoiler' problem," majority opinion at 32–33, 165 P.3d at 933–34, and thus, to fashion a controversy. To achieve this, the majority relies on HRCP Rule 21 (2004).[9] HRCP Rule 21 provides:

> Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately by order of the court.

In utilizing HRCP Rule 21 to drop the County as a defendant, the majority predominantly relies on two federal cases: *Stark v. Indep. Sch. Dist. # 640*, 163 F.R.D. 557 (D.Minn.1995), and *Newman–Green v. Alfonzo–Larrain*, 490 U.S. 826, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989).[10] Both cases are irrele-

---

7. HRCP Rule 25 allows for substitution of parties and states in pertinent part:

 **(a) Death.** (1) If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties....
 (2) In the event of the death of one or more of the plaintiffs or of one or more of the defendants in an action in which the right sought to be enforced survives only to the surviving plaintiffs or only against the surviving defendants, the action does not abate. The death shall be suggested upon the record and the action shall proceed in favor of or against the surviving parties.
 **(b) Incompetency.** If a party becomes incompetent, the court upon motion served as provided in subdivision (a) of this rule may allow the action to be continued by or against the party's representative.
 **(c) Transfer of Interest.** In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party....
 **(d) Public Officers; Death or Separation from Office.**
 (1) When a public officer is a party to an action in an official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party....

 (2) When a public officer sues or is sued in an official capacity, the officer may be described as a party by official title rather than by name; but the court may require the officer's name to be added.
 (Boldfaced font in original.)

8. It may be noted that "HRCP Rule 25 is nearly identical to its federal counterpart." *Roxas v. Marcos*, 89 Hawai'i 91, 119, 969 P.2d 1209, 1237 (1998).

9. HRCP Rule 21 is virtually identical to the Federal Rules of Civil Procedure Rule 21 which provides:

 Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately.

10. As the majority itself notes, the Hawai'i case law which states that " '[a] circuit court has the discretion to realign the parties at any stage of the action and on such terms as are just,' " majority opinion at 33, 165 P.3d at 934 (quoting *Kawamata Farms, Inc. v. United Agri Prods.*, 86 Hawai'i 214, 244, 948 P.2d 1055, 1085 (1997)), is in relation to "the appropriate number of peremptory challenges to be allocated to the parties at trial and, thus, provides little guidance with

vant to this appeal, for in none of the cases is HRCP Rule 21 applied to establish a controversy where one did not already exist.

## A.

In *Stark* the plaintiffs sought a declaratory judgment regarding whether the use of taxpayer funds to support an allegedly religious school was in violation of the Establishment Clause. 163 F.R.D. at 559. The plaintiffs brought suit against the school district, the school board, the Brethern, which they identified as a religious association, and Lloyd Paskewitz (Paskewitz), owner of the school building and surrounding property. *Id.* Paskewitz filed a motion to dismiss. *Id.* at 561. That court, citing Rule 21, dismissed Paskewitz.

It was said that the real Establishment Clause challenge was "directed at the actions of the [s]chool [d]istrict and the Brethern, not at [Paskewitz]." *Id.* According to that court, "[u]nder the circumstances of this case, the [c]ourt has the option to sever and stay the action against [Paskewitz], or to drop him as a party." *Id.* at 564. The district court determined that because "resolution of the dispute among the remaining parties will resolve all claims involving [Paskewitz,]" dismissal was appropriate. *Id.* However, the district court noted that the dismissal was "permissive in character" and "without prejudice." *Id.*

Thus, *Stark* is plainly distinguishable. Because an underlying controversy existed, it was not necessary for the district court, on its own initiative, to drop Paskewitz to create adversaries among the remaining parties as the majority purports to do in this case. Significantly, also, the dismissal in *Stark* was based on a motion by a party, namely the party that was eventually dismissed, and was done "permissive[ly,]" *id.,* not at the behest of the appellate court as is done by the majority here.

## B.

In *Newman–Green*, Newman–Green, Inc., an Illinois corporation, brought a "state-law

contract action in a [d]istrict [c]ourt against a Venezuelan corporation, four Venezuelan citizens, and William L. Bettison [ (Bettison) ], a United States citizen domiciled in Caracas, Venezuela." 490 U.S. at 828, 109 S.Ct. 2218. Newman–Green alleged that the corporation had breached a licensing agreement and that the individual defendants, who were "joint and several guarantors of royalty payments due under the agreement, owed money to Newman–Green." *Id.*

The action was brought under the diversity of citizenship jurisdiction of the district court. But inclusion of Bettison destroyed diversity because, for purposes of diversity jurisdiction, he was "stateless." *Id.* (internal quotation marks and citation omitted). However, neither counsel nor the district court raised this issue and the district court granted partial summary judgment for Newman–Green and partial summary judgment in favor of the individual plaintiffs. *Id.* On appeal, the Seventh Circuit Court of Appeals "inquired as to the statutory basis for diversity jurisdiction" but concluded that Rule 21 did not "empower[ ] appellate courts to dismiss a dispensable party whose presence spoils statutory diversity jurisdiction." *Id.* at 829, 109 S.Ct. 2218.

The narrow issue before the U.S. Supreme Court on certiorari in *Newman–Green* was " 'whether a court of appeals [such as the Seventh Circuit] may do what a district court can do and dismiss a *dispensable nondiverse party itself,* or whether a court of appeal must remand the case to the district court, leaving it to the district court's discretion to dismiss the party.' " Majority opinion at 33–34, 165 P.3d at 934–35 (quoting *Newman–Green*, 490 U.S. at 832–33, 109 S.Ct. 2218) (emphasis added) (brackets omitted). The Court answered this question in the affirmative, determining that "[a]lmost every modern Court of Appeals faced with this issue has concluded that it has the authority to dismiss a dispensable nondiverse party by virtue of Rule 21" and it was "reluctant to disturb this well-settled judicial Construction[.]" *Newman–Green*, 490 U.S. at 833, 109 S.Ct. 2218. As such, the Court conclud-

respect to the circumstances [at issue] here," *id.* at 33, 165 P.3d at 934, where there is no underlying case or controversy between the parties.

ed that it was appropriate for the Seventh Circuit to dismiss Bettison, who was not "indispensable to the suit" in order to preserve diversity. *Id.* at 838, 109 S.Ct. 2218.

Obviously *Newman–Green* is distinguishable from the instant case, as this court does not have federal diversity jurisdiction and the issue of dismissing a *nondiverse* dispensible party would never arise in our court. Despite the fact that this issue could never come before us, the majority relies on the Court's discussion of judicial efficiency and flexibility made in the specific diversity context for the naked proposition that it may "dismiss the County Council as a dispensable defendant in this case." Majority opinion at 33, 165 P.3d at 936. However, the Court in *Newman–Green* decided that "hypertechnical jurisdictional purity" was not necessary because it was allowing an appellate court to do what the trial court could already do *in the particular context of diversity actions:* dismiss dispensable, non-diverse parties "at any time, even after judgment has been rendered." 490 U.S. at 837, 109 S.Ct. 2218.

Clearly, then, *Newman–Green* does not stand for the proposition that Rule 21 allows a party to be dropped in order to create a controversy where no underlying controversy previously existed or for the majority's assertion that purported "judicial efficacy" justifies such action. In *Newman–Green*, the underlying contract dispute that existed among the parties when Bettison was a party remained extant when Bettison was dropped as a party. The dismissal of Bettison as a party had no effect on the pre-existing vitality of the underlying contract controversy. Because there was no question that a controversy existed in *Newman–Green*, as there is in the instant case, the majority's reliance on *Newman–Green* is not correct.

## IX.

The majority contends that "despite the subjective desires of the original parties to this action, it is their *legal interests and duties* that are to be considered when determining whether a suit is adversarial and,

thus, not collusive for purposes of justiciability, *i.e.*, standing." [11] Majority opinion at 32, 165 P.3d at 933 (emphasis added). The majority rests this proposition on *Reynolds, Golden Gate Bridge & Highway Dist. v. Felt*, 214 Cal. 308, 5 P.2d 585 (1931), and *United Pub. Workers, AFSCME, Local 646 v. Yogi*, 101 Hawai'i 46, 62 P.3d 189 (2002). First, the cases upon which the majority relies are inapposite.

### A.

In *Reynolds*, the plaintiffs, husband and wife, were passengers in a vehicle operated by the defendant. 36 Haw. at 556. The plaintiffs each sued the defendant for personal injuries suffered by them arising out of a collision involving the vehicle operated by the defendant and another vehicle. *Id.* The defendant filed a motion to dismiss the husband's case arguing, *inter alia*, that the husband committed "an abuse of process ... in filing the suit under the circumstances as set forth in his letter[.]" *Id.* at 557. The husband, who was associated with the defendant in business prior to the accident, sent the defendant a letter which stated:

> I want to remind you again that we do not propose to look to you for the satisfaction of any judgment. The only way that we can proceed against the insurance company under the Kaufman policy is to sue you, obtain judgment and then sue the insurance company under the policy, alleging and proving that you were driving the car for the Kaufman's [sic] at the time Avis and I got hurt.

*Id.*

On appeal, the *Reynolds* court observed that "[a] collusive action is defined as one brought under a *secret* agreement for the decision of a legal question not involved in a controversy, or one so brought with intent to defraud the other person" and that the bringing of a collusive action "would constitute abuse of the process of the court." *Id.* at 558 (internal quotation marks and citations omitted) (emphasis added). However, this

---

**11.** This assertion relies on the assumption that a usurpation of the County Council's taxing authority has taken place-a determination of the

merits of the case that should take place *after*, not before the presence of a controversy is established.

court did not decide whether the case was a fictitious or collusive one because "[t]he record before [it did] not disclose the terms of the Kaufman policy nor [did] it disclose whether or not the company issuing the policy was given notice of the suit and called upon to defend it." *Id.* at 560. Accordingly, this court said that "we are unable to say and refrain from deciding whether or not the judgment against the defendant will be of any force or effect[.]" *Id.*

### B.

In *Felt*, the respondent, who was the district secretary, refused to sign proposed bonds to be issued by the district. 5 P.2d at 589. The petitioner district demanded that the respondent sign the bonds which were intended to raise money for the construction of the bridge. *Id.* Amici curiae, representing certain taxpayers not parties to the case, filed and argued a motion to dismiss contending that "the proceeding [was] fundamentally collusive in its nature by reason of the fact that there [was] in reality no controversy between petitioner and respondent." *Id.*

The *Felt* court *inter alia* rejected the amici curiae's argument that "the proceeding [was] fictitious and collusive, being a mere attempt to secure an advisory opinion without an actual contest" because "[t]he real controversy ... [was] between the district and taxpayers who are not parties to the suit." *Id.* However, the California court stated that the respondent was "a public official holding office pursuant to the provision made by the statute, and bound by oath to support the Constitution and law of [California]" and that "[h]is signature on the bonds [was] required by statute." *Id.* at 590. Thus, if the respondent's contention that "the legislative provisions giving such power to tax [were] unconstitutional, and that the recital [on the bonds was] therefore incorrect" was "sound, and [if] he were forced to sign, he would be acting in violation of his public duty, and assisting in the deception of prospective purchasers of the bonds." *Id.* (citations omitted).

Hence, in *Felt*, there was already an existing controversy between the district and secretary at the time the suit was filed. Dissimilar to this case, there is no indication the secretary had "admitted" to the allegations of the petition. *Accordingly, antagonistic interests existed when the case was filed and the California court had no hand in realigning the parties so as to create a controversy.*

### C.

I agree with the majority that "[i]n determining whether parties still retain sufficient interests and injury as to justify the award of declaratory relief, the question is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant a declaratory judgment." Majority opinion at 32, 165 P.3d at 933 (quoting *Yogi*, 101 Hawai'i at 57, 62 P.3d at 198) (Acoba, J., concurring) (internal quotation marks, citations, brackets, and ellipses omitted). But in this case, there were no "adverse legal interests" among the parties. Plainly on "the facts alleged" in the amended complaint and as answered by Defendants–Appellees, and in the briefs submitted by them on appeal, there are no "adverse legal interests" because the parties all agree the Charter Amendment is invalid.

### D.

Second, contrary to the majority position, considering the "legal interests and duties" under the facts of this case does not lead to a proper determination that this suit is adversarial. As a preliminary matter, the posited conflict between "the legal interests and duties" only arises because of the improper realignment of the parties by the majority. That realignment is contrary to the pleadings and HRCP Rules 21 and 25. Further, assuming *arguendo* that the "legal interests and duties of the parties conflict," the *legal position* of the parties as expressed in the amended complaint, the answers before the court, the County's brief, and Defendants–Appellees' answering briefs on appeal is that they *all agree* that the Charter Amendment is invalid. Consequently, as to the contending legal interests and duties of the County Council, the Mayor, and the Finance Di-

rector, *their official legal positions are not antagonistic, but the same.*

The majority's formulation of a controversy does not comport with any rule, statute or legal doctrine. It is not unanticipated then, that the County has not argued that it is acting "on behalf" of the County Council, or that the County Council has not maintained that it should be dropped as a defendant from the suit under HRCP Rule 21, or that the parties have not contended realignment in the manner imposed by the majority is an appropriate remedy. Nor is it unexpected that the majority does not cite to any case in which an appellate court has engaged in the methodology the majority employs in this case in order to engender a controversy.

## X.

In the absence of a controversy, the case should be dismissed. Assuming *arguendo* any alleged "practicality" or judicial efficiency applies (even in contradiction to the cases relied on by the majority itself), neither can be a proper justification for deciding cases outside the expressed prescription in the declaratory judgment statute that an actual controversy or real antagonistic interests must exist in the case as presented to us. With all due respect, the torturous route taken by the majority to reach the merits suggests an intrusiveness beyond the appropriate and reasoned exercise of judicial power.

Moreover, not all wisdom resides in the judiciary. In our democracy, governance is a tripartite function. We may decide the legal limits within which the parties may act, but what choices they should make within those limits and what would be in their best interest to effectuate once the law is applied, is prudently and lawfully committed to them. Accordingly, I would dismiss the appeal.[12]

12. Because I would hold that the case should be dismissed, I do not reach the merits of the case.